STATE OF NORTH CAROLINA v. NORMA ANGELICA WILLIAMS

No. COA10-738

(Filed 16 August 2011)

**1. Appeal and Error—appealability—writ of certiorari—timely written notice of appeal**

Although defendant petitioned for a writ of *certiorari*, defendant's right to appeal was already preserved. Defendant timely filed a written notice to appeal the denial of her motion to suppress.

**2. Evidence—findings of fact—sufficiency of evidence**

The trial court did not err in a drugs case by concluding there was competent evidence to support its findings of fact numbers 4, 5, and 9. The findings demonstrated uncertainties and inconsistencies regarding the point of origin and destination for travel. The misstatement in number 9 that defendant produced a driver's license instead of a state-issued identification card was inconsequential and *de minimus*.

**3. Search and Seizure—traffic stop—extended detention—reasonable suspicion—uncertainties and inconsistencies**

The trial court did not err in a drugs case by concluding that defendant and her companion's extended detention was supported by reasonable suspicion. The totality of the circumstances revealed a reasonable articulable suspicion that criminal activity was afoot based on muddled stories consisting of numerous uncertainties and inconsistencies.

1

STATE v. WILLIAMS

[215 N.C. App. 1 (2011)]

Judge McGEE dissenting.

Appeal by Defendant from judgment entered 3 November 2009 by Judge Christopher M. Collier in Iredell County Superior Court. Heard in the Court of Appeals 25 January 2011.

*Attorney General Roy Cooper, by Special Deputy Attorney General J. Allen Jernigan, for the State.*

*Michele Goldman, for Defendant.*

BEASLEY, Judge.

Where the trial court denied Defendant's motion to suppress and competent evidence supports its findings of fact and conclusions of law, we affirm.

Sergeant Randy Cass (Sgt. Cass) of the Iredell County Sheriff's Office was on patrol on 21 May 2008 when, around 11:00 a.m., he observed an SUV with tinted windows heading south on Interstate 77 (I-77). Believing the window tinting to be in violation of North Carolina law, Sgt. Cass stopped the SUV and immediately approached the driver's side. Sgt. Cass asked the driver, Michelle Perez (Perez), to step out of the vehicle, and then asked her several questions. Perez told him that the SUV belonged to her passenger Norma Angelica Williams (Defendant), and Sgt. Cass then asked Perez where their trip originated. Perez told him that she flew to Houston from Arizona to meet Defendant and drive her "to go DJ somewhere" but referred further questions about their trip to Defendant because it was Defendant's "gig," and Perez was not familiar with the details of their travel plans and destination.

Sgt. Cass approached Defendant and asked if she owned the SUV. Defendant replied that she did not own the vehicle but explained that she had arranged to purchase the car from the friend to whom it belonged. Defendant produced two identification cards, each issued by the states of Arizona and Texas respectively, containing consistent information. Sgt. Cass asked where she and Perez were traveling, and Defendant told him that they "were trying to get to Club Kryptonite and showed [him] a map to Myrtle Beach, South Carolina, and then asked [him] directions on how to get there." Sgt. Cass also asked where they were coming from, and Defendant responded that they were travelling from Louisville, Kentucky. Defendant gave Sgt. Cass the SUV's registration and continued to answer his questions, telling him that she and Perez were cousins and that she had recently moved to Texas from Arizona.

**STATE v. WILLIAMS**

[215 N.C. App. 1 (2011)]

Sgt. Cass left Defendant and returned to speak with Perez, inquiring about her city of departure and her relationship with Defendant. Perez told him that she flew from Tucson, Arizona, and explained that she and Defendant refer to each other as cousins because of their longstanding relationship. Sgt. Cass then asked Perez to sit in his cruiser as he issued her a warning ticket. For about ten minutes, Sgt. Cass and Perez engaged in "small talk" addressing matters such as Perez's occupation. Meanwhile, Sgt. Cass contacted Blue Light Operational Center (BLOC), which he described as "an agency through United States customs that we're in access with . . . for the check of the wanted persons or the vehicle, the criminal history, [and] the driver's license." Sgt. Cass provided BLOC with information on the SUV, Perez's driver's license, and Defendant's Texas identification card, and answered BLOC's questions regarding Defendant and Perez's route from Kentucky to South Carolina. At some point while Sgt. Cass and Perez were in the cruiser, BLOC verified "that everything was good."

After issuing a warning citation to Perez, Sgt. Cass asked her if there was any contraband, weapons or large quantities of cash in the SUV, and she indicated there was not. Sgt. Cass then asked her if he could search the SUV, but Perez did not consent. Sgt. Cass then asked Defendant if there was any contraband in the SUV, and she stated there was none. Sgt. Cass informed the women that he had requested that a canine trained in drug detection inspect the SUV. Approximately ten minutes later, Sgt. Elliott[1] arrived and walked a canine around the SUV. The canine "alerted" on the SUV, indicating a possible presence of narcotics. Based on the dog's reaction, Sgt. Cass, Sgt. Elliott, and a third officer searched the SUV and recovered a large quantity of marijuana located in the SUV.

Defendant was arrested and was indicted on 11 August 2008 for trafficking in marijuana by possession and trafficking in marijuana by transporting. Perez was not indicted on any charges. On 12 September 2008, Defendant filed a motion to suppress the marijuana recovered from the search of the SUV. On 3 August 2009, a hearing on Defend-ant's motion to suppress was held. Sgt. Cass testified at the hearing, and a video of the stop, including audio portions, was admitted into evidence.

The trial court denied Defendant's motion to suppress on 5 August 2009. Defendant entered into a plea agreement whereby she

---

1. Sergeant Elliott's first name does not appear in the record.

would plead guilty to one count of trafficking marijuana in exchange for the dismissal of the second count. On 3 November 2009, judgment was entered and Defendant was sentenced to an active term of twenty-five to thirty months. Defendant appeals.

I.

[1] Defendant has petitioned our Court for writ of certiorari out of precaution that her right to appeal was not preserved. We have reviewed the record and believe Defendant's right to appeal in this matter is preserved. Defendant timely filed a written notice to appeal the denial of her motion to suppress. On 28 October 2009, the trial court accepted Defendant's plea agreement with the State. At the plea hearing, both Defendant's counsel and the trial court indicated Defendant would be appealing the denial of the motion to suppress. On 3 November 2009, judgment was entered. At the sentencing hearing, the State, Defendant's counsel, and the trial court all proceeded as if Defendant had properly entered notice of appeal.

Because the transcript from the sentencing hearing does not include an express statement of Defendant's intent to appeal, we have no way of knowing whether Defendant's counsel gave oral notice of appeal before transcription of the proceedings began. However, the record reflects that the State, the trial court, and Defendant's counsel all proceeded as if proper notice of appeal had been properly noted. Upon Defendant's request, the trial court appointed the Appellate Defender's Office to represent her, and stayed the execution of judgment pending resolution of the matter in the Court of Appeals. The trial court stated in its Appellate Entries form that "[D]efendant has given Notice of Appeal to the N.C. Court of Appeals," and "ordered that [Defendant] is allowed to appeal as an indigent."

Where we presume the "regularity and correctness" of the actions of the trial court unless the record proves otherwise, *In re A.R.H.B. & C.C.H.L.*, 186 N.C. App. 211, 219, 651 S.E.2d 247, 253 (2007), we do not believe, on these facts, that the trial court's finding that Defendant gave notice of appeal is sufficiently contradicted by the record. We therefore address the merits of Defendant's appeal.

II.

[2] Defendant first contends the trial court lacked competent evidence to support Findings of Fact 4, 5, and 9, arguing that there was no competent evidence to support them. As Defendant does not challenge the remaining findings of fact, they are binding on this Court.

**STATE v. WILLIAMS**

[215 N.C. App. 1 (2011)]

*See State v. Biber,* ___ N.C. ___, ___, ___ S.E.2d ___, ___ (No. 423A10, filed 16 June 2011) ("[W]hen, as here, the trial court's findings of fact are not challenged on appeal, they are deemed to be supported by competent evidence and are binding on appeal.").

Our standard of review for the denial of a motion to suppress is as follows:

> [T]he trial court's findings of fact are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting. This Court must not disturb the trial court's conclusions if they are supported by the court's factual findings. However, the trial court's conclusions of law are fully reviewable on appeal. At a suppression hearing, conflicts in the evidence are to be resolved by the trial court. The trial court must make findings of fact resolving any material conflict in the evidence.

*State v. McArn,* 159 N.C. App. 209, 211-12, 582 S.E.2d 371, 373-74 (2003) (internal quotation marks and citations omitted). Moreover,

> [a]n appellate court accords great deference to the trial court's ruling on a motion to suppress because the trial court is entrusted with the duty to hear testimony (thereby observing the demeanor of the witnesses) and to weigh and resolve any conflicts in the evidence. Our review of a trial court's denial of a motion to suppress is strictly limited to a determination of whether [its] findings are supported by competent evidence, and in turn, whether the findings support the trial court's ultimate conclusion.

*State v. Hernandez,* 170 N.C. App. 299, 303-04, 612 S.E.2d 420, 423 (2005) (internal quotation marks and citations omitted).

In general, "[t]he scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer,* 460 U.S. 491, 500, 75 L. Ed. 2d 229, 238 (1983). This Court requires that "[t]he stop . . . be based on specific and articulable facts, as well as the rational inferences from those facts, as viewed through the eyes of a reasonable, cautious officer, guided by his experience and training." *State v. Watkins,* 337 N.C. 437, 441, 446 S.E.2d 67, 70 (1994) (citing *Terry v. Ohio,* 392 U.S. 1, 21-22, 20 L. Ed. 2d 889, 906 (1968)). "A court must consider 'the totality of the circumstances—the whole picture' in determining whether a reasonable suspicion to make an investigatory stop exists." *Watkins,* 337 N.C. at 441, 446 S.E.2d at 70 (quoting *United States v. Cortez,* 449 U.S. 411, 417, 66 L. Ed. 2d 621, 629 (1981)).

In Finding of Fact 4, the trial court found that Sgt. Cass asked Perez where they were coming from, and "Perez eventually stated they were coming from Houston, Texas, even though they were traveling south on the interstate." However, Sgt. Cass knew that, because Defendant and Perez were travelling south on I-77, it was illogical that they would be travelling from Houston. Sgt. Cass testified at the suppression hearing that when he sought clarification from Perez about where their travel commenced, he

> asked [Ms. Perez] where she was coming from and she said that she had just flew [sic] out of Houston and not sure where she was coming from. So I started asking her, I said, no, I mean like right now, where are you coming from now? And she was making comments like from Houston.

As Sgt. Cass testified, when Perez told him they were travelling from Houston, he asked, "right now you're coming from Houston? And she said yeah. I was like, Houston what? Houston, Texas. I'm like, you're going south on 77, you know, Houston is on further south and you're indicating that's where you're coming from."[2] Thus, competent evidence supported the trial court's finding that Perez told Sgt. Cass that she and Defendant were coming from Houston, notwithstanding the fact that they were travelling in a southerly direction.

While Defendant makes much of the fact that Perez did not *eventually* state that they were coming from Houston but, rather, did so immediately, Defendant failed to demonstrate that the findings of fact are not supported by the evidence. Defendant contends that by using the word "eventually," the trial court inaccurately implies a delay in Perez's response to the question. However, assuming *arguendo* that the evidence does not support this temporal element included in Finding of Fact 4, the finding of fact would still be supported by the evidence that Perez had identified, whether eventually or immediately, a point of origin that not only rendered her and Defendant's route illogical, but also that contradicted the information provided to Sgt. Cass by Defendant.

In contrast to the information provided by Perez, Defendant told Sgt. Cass, as the trial court found in Finding of Fact 7, that "they were coming from Kentucky." The dissent stresses that both Perez and Defendant told Sgt. Cass that Perez flew into Houston, that Defendant met her there, and that Houston is where their trip began; Perez

2. Travel from Houston, Texas to Myrtle Beach, South Carolina as computed by Mapquest.com and RandMcNally.com is not routed by way of I-77 South.

admittedly did not know the origin of their travel *that day*. Therefore, because Perez had initially told Sgt. Cass that she and Defendant were coming from Houston "*right now*", Perez and Defendant's statements as to the origin of their travel conflicted. Because the evidence supports the trial court's Finding of Fact 4 and Defendant demonstrates no prejudice related to the error alleged, this argument is overruled.

Defendant challenges the trial court's Finding of Fact 5 which states, "[t]hat during this conversation Perez could not articulate their destination, even in general terms, even though she was driving the vehicle. Perez further stated that she and the defendant were cousins."

When Sgt. Cass asked Perez from where she and Defendant were travelling, she told him that she had flown from Arizona to Houston, Texas. But, other than her understanding that their ultimate destination was Defendant's DJ gig, Perez was "unsure as to where she was driving to." Perez referred all questions to Defendant because she asserted that she did not know the trip's details. In fact, the most Perez knew about their destination was that it was circled on Defendant's map. It is undisputed that Perez was the driver, and her inability to approximate any ultimate geographic location is competent evidence to support Finding of Fact 5. This argument is overruled.

Defendant also challenges the portion of Finding of Fact 9 that she "produced driver's licenses from the states of Arizona and Texas and had indicated the car was owned by a friend of hers, that she intended to purchase it."

It is correct that Sgt. Cass testified that Defendant produced state-issued identification cards, not driver's licenses. The purpose of Defendant's producing documentation was to prove her identity to Sgt. Cass, not to demonstrate that she was a licensed driver, as she was not driving the SUV at the time of the stop. This discrepancy, however, is inconsequential to the trial court's consideration of the evidence and to the outcome of this case. Therefore, the misstatement in Finding of Fact 9 is *de minimus*, and this argument is overruled.

The fact that Defendant challenges the above-stated findings of fact does not suggest that a material conflict in the evidence exists. "[F]or purposes of section 15A-977(f), a material conflict in the evidence exists when evidence presented by one party controverts evidence presented by an opposing party such that the outcome of the matter to be decided is likely to be affected." *State v. Baker*, ___ N.C. App. ___, ___, 702 S.E.2d 825, 831 (2010). As in *Baker*, where this

Court held that "[t]he fact that defendant presented **evidence** is not, and cannot, by itself, be dispositive of whether a material conflict in the **evidence** existed," *id.* at ___, 702 S.E.2d at 830 (emphasis added), there is no material conflict in the evidence here, and the findings of fact were supported by competent evidence.

III.

[3] Defendant concedes that the initial stop was lawful; thus, we do not address the constitutionality of the traffic stop. Rather, Defendant argues that the detention after Perez and Defendant's identification was returned was not supported by reasonable suspicion and therefore violated Defendant's right under the Fourth Amendment to the United States Constitution and Section 20 of Article I of·the North Carolina Constitution. We disagree.

"Once the original purpose of the stop has been addressed, there must be grounds which provide a reasonable and articulable suspicion in order to justify further delay. *State v. Falana,* 129 N.C. App. 813, 816, 501 S.E.2d 358, 360 (1998); *see also Alabama v. White,* 496 U.S. 325, 330, 110 L. Ed. 2d 301, 309 (1990) ("[T]he 'totality of the circumstances—the whole picture[—]' . . . must be taken into account when evaluating whether there ˌis reasonable suspicion." (quoting *United States v. Cortez,* 449 U.S. 411, 417, 66 L. Ed. 2d 621, 629 (1981)); *accord State v. Watkins,* 337 N.C. 437, 441, 446 S.E.2d 67, 70 (1994). "After a lawful stop, an officer may ask the detainee questions in order to obtain information confirming or dispelling the officer's suspicions." *State v. McClendon,* 350 N.C. 630, 636, 517 S.E.2d 128, 132 (1999) (citing *Berkemer v. McCarty,* 468 U.S. 420, 82 L. Ed. 2d 317 (1984)).

We must resolve whether the "totality of the circumstances" in the case *sub judice* gave rise "to a reasonable articulable suspicion that criminal activity was afoot" to justify Sgt. Cass' extended detention of Defendant. *See State v. Myles,* 188 N.C. App. 42, 47, 654 S.E.2d 752, 756 (2008) (internal quotation marks and citations omitted). "To determine reasonable articulable suspicion, courts view the facts through the eyes of a reasonable, cautious officer, guided by his experience and training at the time he determined to detain defendant." *Id.* (internal quotation marks and citation omitted).

Defendant attempts to support her argument that the trial court's findings of fact do not support its conclusions with our Court's decisions in *Falana* and *Myles.* We disagree.

In *Falana*, a trooper observed a car weaving and suspected that the driver was impaired. He detained the vehicle and noticed that the driver breathed rapidly and hesitated to answer the trooper's question. The trooper also found it suspicious that the passenger did not know whether he and the driver left New Jersey on Saturday or Sunday. *Falana*, 129 N.C. App. at 814-15, 501 S.E.2d at 358-59. Our Court held that these factors alone did not give rise to reasonable suspicion that criminal activity was afoot. *Id.* at 817, 501 S.E.2d at 360.

This Court's determination in *Myles* that the officer did not have reasonable suspicion to support an extended detention of a motorist and his passenger is also distinguishable. *See Myles*, 188 N.C. App. at 51, 654 S.E.2d at 758. Upon stopping a vehicle for suspected impaired driving, the officer did not smell alcohol. *Id.* at 43, 654 S.E.2d at 753. When he asked for the driver's license and registration, the officer learned that the vehicle had been rented and then asked for the passenger's license because the rental agreement was in his name. *Id.* After the license check, the officer issued a warning ticket, then asked the driver to step out of the vehicle, and spoke to the passenger and driver separately. *Id.* at 43, 654 S.E.2d at 753-54. He noticed that both were extremely nervous and gave different dates for the rental car to be returned. *Id.* at 43-44, 654 S.E.2d at 753-54. The officer had testified, however, that he did **not** believe the driver was impaired, the driver's license check revealed no outstanding violations, and he found nothing suspicious about the overdue rental car. *Id.* at 47-48, 654 S.E.2d at 756. Thus, the detention was not supported by reasonable suspicion. The sole basis for the officer's suspicion that criminal activity was afoot was the nervousness of the driver and the defendant, and we announced that nervousness cannot be the sole factor supporting reasonable suspicion. *See id.* at 50, 654 S.E.2d at 757-58 ("Although our Supreme Court previously has stated nervousness can be a factor in determining whether reasonable suspicion exists our Supreme Court has never said nervousness alone is sufficient to determine whether reasonable suspicion exists when looking at the totality of the circumstances.").

Unlike *Falana and Myers*, several factors permitted Sgt. Cass to form reasonable suspicion: (1) he stopped the SUV, in which Defendant was a passenger, because it "appeared to [have] illegally tinted windows"; (2) the driver, Perez, did not know the name of the city from which the pair travelled nor any details about their destination; (4) Perez and Defendant were travelling on I-77 purportedly from Louisville, KY to Myrtle Beach, SC which is an indirect route; (5)

Defendant initially stated that Perez was her cousin, but later stated she and Perez "simply called each other cousins based on their close and long term relationship"; and (6) while Perez told Sgt. Cass that Defendant owned the SUV, Defendant stated that a friend of hers was the owner, but that she intended to purchase it. While some of these factors—such as the interstate driver's complete unawareness as to where she was bound and the dubious route given—are more weighty than others—such as the initially imprecise information as to vehicle ownership and the women's relationship, which was later amended with corrective details—the totality of the circumstances reveals a muddled story imbued with uncertainties and inconsistencies.

We conclude that the extended detention was supported by reasonable articulable suspicion. Sgt. Cass testified that

> Ms. Perez' inaccurate, or not inaccurate, but unknown story locations of where she was coming from and going to; the conflict in the stories of being family; the third party vehicle at that point, that the owner was not present at that time; the dark tinted windows which a lot of times are used to try to conceal the identity of the people going up and down the interstate of drug couriers or money launderers.

Courts often consider the risk to law enforcement officers and their ability to discern factors suggesting that drug activity may be afoot. In forming reasonable suspicion, one factor that law enforcement officers are permitted to consider is tinting on vehicle windows. There are many cases which address the risk that tinting poses to officer safety, *see United States v. Stanfield*, 109 F.3d 976, 981-82 (4th Cir. 1997) ("[O]fficers face an 'inordinate risk' every time they approach even a vehicle whose interior and passengers are fully visible to the officers, [and] the risk these officers face when they approach a vehicle with heavily tinted windows is, quite simply, intolerable." (citation omitted)).

Sgt. Cass stopped Perez and Defendant because the vehicle in which they rode had tinted windows in violation of state law, *see* N.C. Gen. Stat. § 20-127(b), (d) (2009), and cited Perez for the violation. Further, Perez and Defendant gave conflicting statements about the origin of their travel; Perez told Sgt. Cass that Defendant, with whom she had a "close and long term relationship" as the trial court found in Finding of Fact 8, was the owner of the SUV, while Defendant stated that although she intended to purchase the vehicle, it actually belonged to a friend, as the court found in Finding of Fact 9. Perez did

not know the pair's purported destination, and their choice of route on I-77 South seemed incongruous with travel to Myrtle Beach from either Houston or Louisville. Sgt. Cass had the opportunity to establish reasonable suspicion that criminal activity was afoot, and the trial court made findings of fact and conclusions of law supported by competent evidence.

While the trial court made no findings of fact about either Perez or Defendant's nervousness, Perez can be heard on the audio from Sgt. Cass' patrol vehicle stating she was nervous. However, the trial court's findings of fact demonstrate that Defendant and Perez provided Sgt. Cass with information, or a lack thereof, including various inconsistencies therein, which objectively created a reasonable suspicion. The trial court stated in Finding of Fact 4 that "Perez eventually stated they were coming from Houston, Texas, even though they were traveling south on the interstate," and in Finding of Fact 5 the court found that "Perez could not articulate their destination, even in general terms, even though she was driving the vehicle." The fact that a driver has absolutely no idea where she is headed is markedly different from the *Falana* confusion over which day a trip began on. In Finding of Fact 7, the trial court found that "Ms. Williams stated they were coming from Kentucky and headed to Club Kryptonite in Myrtle Beach." Perez and Defendant's statements are inconsistent. Further, in Finding of Fact 5, the court found that "Perez further stated that she and the defendant were cousins. In Finding of Fact 8, the court found that "[w]hen asked[,] Williams said that Perez was her cousin and claimed a familial relationship initially, but then later stated they simply called each other cousins based on their close and long term relationship." The trial court's findings of fact demonstrate totality of the circumstances characterized by uncertainties and inconsistences, which are supported by competent evidence and further support the trial court's conclusion that reasonable suspicion justified Defendant's extended detention. Therefore, we affirm.

Affirmed.

Judge BRYANT concurs.

Judge McGEE dissents.

McGEE, Judge, dissenting.

I respectfully dissent from the majority holding because I do not believe the trial court's findings of fact support a conclusion that

Sergeant Cass had a reasonable suspicion sufficient to detain Defendant after the issuance of a warning citation for tinted windows.

At the suppression hearing, the trial court made the following relevant findings of fact:

2. That about 10:55 AM [Sgt. Cass] observed a white SUV with what appeared to be illegally tinted windows, at which time he initiated a traffic stop.

3. Sgt. Cass approached the vehicle and spoke with the occupants briefly, then asked the driver, later identified as [Ms.] Perez, to step out of the vehicle.

4. The officer had [Ms.] Perez step to the front of his vehicle and asked where they were coming from. [Ms.] Perez eventually stated they were coming from Houston, Texas, even though they were traveling south on the interstate.

5. That during this conversation [Ms.] Perez could not articulate their destination, even in general terms, even though she was driving the vehicle. [Ms.] Perez further stated that she and [Defendant] were cousins.

6. Sgt. Cass then spoke with the passenger, later identified as [Defendant], who was still seated in the vehicle.

7. During this conversation [Defendant] stated they were coming from Kentucky and headed to Club Kryptonite in Myrtle Beach.

8. When asked[,] [Defendant] said that [Ms.] Perez was her cousin and claimed a familial relationship initially, but then later stated they simply called each other cousins based on their close and long term relationship.

9. [Defendant] produced driver's licenses from the states of Arizona and Texas and had indicated the car was owned by a friend of hers, that she intended to purchase it. The officer then at 11:04 AM told [Ms.] Perez that she was going to get a warning ticket, at which time she was seated in the vehicle.

I.

I disagree with the majority concerning the relevance of the trial court's errors in its findings of fact.

**STATE v. WILLIAMS**

[215 N.C. App. 1 (2011)]

A.

First, the trial court, by determining in Finding of Fact 4 that Ms. Perez only "eventually" stated that she was coming from Houston, suggests it found that Ms. Perez was being evasive or non-responsive when she was asked where she was coming from. An attempt to evade answering questions can be factored in a reasonable suspicion analysis. *State v. McClendon*, 350 N.C. 630, 637, 517 S.E.2d 128, 133 (1999).

Sergeant Cass testified at the hearing as follows:

And [I] asked [Ms. Perez] where she was coming from and she said that she had just flew out of Houston and not sure where she was coming from. So I started asking her, I said, no, I mean like right now, where are you coming from now? And she was making comments like from Houston. I'm like, right now you're coming from Houston? And she said yeah. I was like, Houston what? Houston, Texas. I'm like, you're going south on 77, you know, Houston is on further south and you're indicating that's where you're coming from.

. . . .

I had asked Ms. Perez where they were going and she said she wasn't sure, that she was going to DJ somewhere, speaking of [Defendant], and she had it marked down on the map. So that's when I walked back up talking with [Defendant]. And [Defendant] indicated they was [sic] going to Club Kryptonite, I believe is the way that you say it, and showed me a map to Myrtle Beach and then started asking me about directions on how to get there.

. . . .

Q. Did you have a conversation at some point with [Defendant] about where they were coming from?

A. [Sergeant Cass] Yes, I did earlier when she was showing me the map.

Q. And what, if anything, did she indicate to you about where they were coming from?

A. There [sic] were coming from I believe it was Louisville, Kentucky. Yes, coming from Kentucky.

Q. And what had Ms. Perez told you about where they were coming from?

A. She didn't know.

THE COURT: Well, I thought you said Houston, Texas.

[Sergeant Cass]: That's what she originally said, that she had flown into Houston. And when I started saying Houston is here, you know, you're coming south, she couldn't tell me where she was coming from.

Sergeant Cass was asked at the hearing:

[I]sn't it correct that Ms. Perez told you right to begin with that she had come from Houston, and later on when you were talking to her in the side of the road and you asked her where she had come from and she said she had flown in from Houston?

Sergeant Cass answered: "That is correct."

Sergeant Cass's undisputed testimony was that Ms. Perez initially told him she had flown into Houston, and that was where she was coming from. Upon further questioning by Sergeant Cass, Ms. Perez told him that she did not know where she and Defendant were driving from, or where they were headed, because Ms. Perez was unfamiliar with the geography of the area since she had only ever traveled to Tucson, Houston, and California. Ms. Perez said that Defendant had picked her up at the airport in Houston and that she (Ms. Perez) was driving Defendant to a club where Defendant was going to DJ a show. Ms. Perez told Sergeant Cass that she simply drove where Defendant told her to go, and that Defendant had the trip mapped out. When Sergeant Cass asked Defendant the same questions, Defendant told Sergeant Cass they were coming from Louisville, Kentucky, and were on their way to Myrtle Beach, South Carolina. Defendant showed Sergeant Cass a map and asked for help in determining the best route to Myrtle Beach.

To the extent the trial court's finding of fact indicated Ms. Perez "eventually" told Sergeant Cass that she and Defendant were coming from Houston, it is not supported by the evidence presented at the hearing. There is no competent evidence in the record to support the trial court's finding that, when Sergeant Cass asked Ms. Perez where she was coming from, Ms. Perez "*eventually* stated they were coming from Houston, Texas." (Emphasis added).

**STATE v. WILLIAMS**

[215 N.C. App. 1 (2011)]

The majority states that this error is not prejudicial, as "the finding of fact would still support the belief that Perez had identified, whether eventually or immediately, a point of origin that not only rendered her and Defendant's route illogical but also contradicted the information provided by her passenger." There is no dispute that if Defendant and Ms. Perez were heading directly from Houston to Myrtle Beach, their route on Interstate 77 South would be "illogical." I have no quarrel with Sergeant Cass's testimony that he was initially suspicious of Ms. Perez's claim that she and Defendant were coming directly from Houston. As Sergeant Cass's own statements on the video show, however, this initial suspicion was alleviated.

> Sgt. Cass: *That was what was throwing me off awhile ago.* I was like that ain't makin' sense. You don't even know where you are at here. (Emphasis added).

> Ms. Perez: Yeah, and then [Defendant is] like just drive me and I don't know. I haven't been out of . . . I only went to Houston . . . I only went to California . . . [f]rom Tucson, I've only been to California and to Houston.

> Sgt. Cass: Right.

> Ms. Perez: And that's my only places I've been, anywhere. Everything's new to me right here.

Ms. Perez told Sergeant Cass right away that she did not know the details about the trip because it was Defendant's "gig" and this was only the second trip Ms. Perez had ever taken outside Arizona—and the first to the Southeast. Ms. Perez told Sergeant Cass that Defendant had a map with their destination circled, and that Defendant was the one who knew the details about the trip. Ms. Perez just drove where Defendant instructed her to drive. Defendant's statements to Sergeant Cass did not contradict Ms. Perez's. In fact, they corroborated what Ms. Perez was stating: Defendant was headed to a "gig," Defendant did have a map with their destination, and Defendant was able to tell Sergeant Cass the details of their trip. I do not believe the majority's statement that Ms. Perez "had initially told the officer that she was coming from Houston *right now*" is supported by the record. Ms. Perez never stated that she was coming from Houston "right now," only that she came from Houston. As was later clarified, so far as driving Defendant was concerned, her trip originated in Houston. Though Sergeant Cass's initial confusion was understandable, subsequent events and his own testimony indicate that this confusion was cleared up before he issued the warning citation.

### B.

The majority considers the error in the trial court's ninth Finding of Fact to be *de minimis*: "[Defendant] produced driver's licenses from the states of Arizona and Texas[.]" In fact, as Ms. Perez had indicated, Defendant did not have a driver's license. When asked for identification by Sergeant Cass, Defendant produced two identification cards, not driver's licenses. One was from Arizona, where both Ms. Perez and Defendant indicated Defendant had lived for most of her life, and the other was from Texas, where both Ms. Perez and Defendant indicated Defendant had moved and was currently living. No competent evidence exists supporting the trial court's finding of fact that Defendant produced driver's licenses from two different states. Having driver's licenses from multiple states is a violation of N.C. Gen. Stat. § 20-4.25 (2009).

### C.

The majority holds that the trial court's fifth Finding of Fact was supported by competent evidence. The fifth finding states:

That during [the conversation between Sergeant Cass and Ms. Perez,] [Ms.] Perez could not articulate [Ms. Perez's and Defendant's] destination, even in general terms, even though she was driving the [SUV].

As discussed above, Ms. Perez did not know the name of the last city she and Defendant had been in, nor their destination. Ms. Perez, after being asked by Sergeant Cass if the SUV was hers, answered: "No, it's [Defendant's]. I'm driving for her because she doesn't have a license and she's gonna go D.J. somewhere." Sergeant Cass then asked where they were coming from, and Ms. Perez responded: "From Houston. I flied [sic] out because she wanted me to drive for her. So that's why I flew out because we're driving, umm, I'm not even sure where we're driving to. Ask her because she knows everything because it's her gig."

Though Ms. Perez had already volunteered that she did not know their destination, Sergeant Cass again asked her where she and Defendant were heading. Ms. Perez again indicated that she was uncertain, but that Defendant had a map with their destination circled. Sergeant Cass then questioned Defendant, who was still seated in the SUV, about their trip, and Defendant stated that they were coming from Louisville, Kentucky, and heading to Club Kryptonite in Myrtle Beach, South Carolina. Defendant showed Sergeant Cass a map, and asked him for directions.

The competent evidence shows that, though Ms. Perez did not know the name of their destination city, she told Sergeant Cass that they were heading to a club where Defendant had a "gig," and that Defendant could provide more detailed information about their destination. The information provided by Ms. Perez was corroborated by Defendant when Sergeant Cass questioned Defendant. I would hold that the competent evidence does not support the trial court's finding of fact that Ms. Perez "could not articulate their destination, *even in general terms*[.]" (Emphasis added).

## II.

I would note that subsequent to its denial of Defendant's motion to suppress, the trial court stated that "it was a close case." The pertinent findings that support the trial court's conclusion that Sergeant Cass had a reasonable articulable suspicion to detain Defendant after the issuance of the warning citation are: (1) Sergeant Cass stopped the SUV, in which Defendant was a passenger, because the SUV "appeared to [have] illegally tinted windows." (2) Ms. Perez, who was driving, did not know the name of the destination city for that day's drive. (3) Defendant initially stated that Ms. Perez was her cousin, but later stated she and Ms. Perez "simply called each other cousins based on their close and long term relationship." (4) Defendant stated the SUV was owned by a friend of hers, but she intended to purchase it.

I do not include the trial court's finding that suggests Ms. Perez only *eventually* told Sergeant Cass that she was coming from Houston. I also do not include, as a supporting finding of fact, that Defendant had two driver's licenses—one from Arizona and one from Texas. Most importantly, Sergeant Cass *never* testified that the fact Defendant had two identification cards from two different states contributed to his belief that criminal activity may have been afoot. Further, because the two identification cards were entirely consistent with information provided by both Defendant and Ms. Perez concerning Defendant's prior and current residency, I do not find them particularly relevant. Had Sergeant Cass testified to their relevance in making his determination, and had Defendant produced two *driver's licenses* from different states, as the trial court erroneously found, this evidence might have been entitled to more weight.

The majority includes added "findings" in its opinion that were not made by the trial court. The trial court did not find that Ms. Perez "did not know the name of the city from which the pair travelled[;]" the trial court only found that Ms. Perez told Sergeant Cass that they

came from Houston, which was corroborated by Defendant. The majority seems to find some relevance in the fact that tinted windows may pose a threat to officers, as tinted windows make it more difficult for officers to observe what is happening inside a vehicle when they approach. While true, this fact has no relevance in the case before us, and the trial court made no finding of fact related to this danger. There is no evidence or testimony that Sergeant Cass ever felt threatened. The trial court made no finding of fact involving Ms. Perez's statement that the SUV belonged to Defendant. Sergeant Cass gave no testimony that he found this suspicious. No inference can be made from the findings of fact that the trial court considered it suspicious that Ms. Perez, who had a "close and long term relationship"[1] with Defendant, stated that Defendant "owned" the SUV whereas Defendant stated that she was in the process of purchasing the SUV from a friend. The trial court made no finding of fact that the route of Defendant and Ms. Perez south on Interstate 77 was a "suspicious" route to take from Kentucky to Myrtle Beach. Sergeant Cass never questioned Ms. Perez or Defendant concerning this route, and never testified that he found it even the least bit suspicious. Sergeant Cass never raised the issue of this route at the suppression hearing, and our Court does not make factual determinations. The majority further discusses the purported "nervousness" of Ms. Perez in support of its determination. Notably, the trial court made no finding of fact related to Sergeant Cass's testimony that, when Ms. Perez got into his cruiser, "she then became very nervous and said that she was nervous because of seeing cars getting hit on the TV[,]" and that she appeared "fidgety." I assume the trial court considered this testimony and rejected it as having no relevance to its determinations. Further, Sergeant Cass did not testify that Ms. Perez's "nervousness" was a basis for his suspicion. Sergeant Cass did not charge Ms. Perez with any crime whatsoever—he only issued Ms. Perez a warning citation for the tinted windows infraction.

The State argues that the case before us is factually analogous to *State v. McClendon,* 350 N.C. 630, 517 S.E.2d 128 (1999), stating that both cases "involved nervousness, vague and unreasonable travel information, inconsistent stories and ownership of the vehicle by an absent third party." I first note that, though the State relies heavily on the assertion that Ms. Perez was acting nervous during the stop, the trial court made no finding of fact to support that assertion, and I find

---

1. I note that the trial court did not find this "close relationship" as fact; the trial court found as fact that Defendant had stated such.

little evidence that would support such a finding. Therefore, it is improper to consider any "nervousness" on the part of Ms. Perez.

Nor did the trial court find as fact that Defendant and Ms. Perez gave inconsistent stories. The State argues that Defendant and Ms. Perez gave inconsistent stories regarding their relationship to each other, and the majority states that the trial court's findings "demonstrate a totality of the circumstances characterized by uncertainties and inconsistencies[.]" However, the trial court made no finding that Defendant's "story" was inconsistent with Ms. Perez's "story." The trial court merely found that Defendant first stated she and Ms. Perez were cousins and later stated that they called each other cousins "based on their close and long term relationship." Ms. Perez gave the exact same "story" to Sergeant Cass, though this is not mentioned in the trial court's findings of fact. *See State v. Myles*, 188 N.C. App. 42, 50-51, 654 S.E.2d 752, 758 (2008).

Ms. Perez *volunteered* that she did not know the name of their destination city, but told Sergeant Cass that Defendant did, and had the destination circled on a map. When Sergeant Cass asked Defendant their destination, she answered readily, and showed him the map Ms. Perez had mentioned. Ms. Perez's knowledge of the travel information can reasonably be termed vague, but it does not appear to be unreasonable, and the trial court made no such finding. Defendant's knowledge of their travel information was not vague. Defendant told Sergeant Cass where they were driving from, that they were headed to Myrtle Beach, showed him a map, and even asked for the best route.

BLOC informed Sergeant Cass that the SUV was not stolen and there was nothing otherwise suspicious about the SUV; and Sergeant Cass testified he "knew that [Defendant] was . . . going to purchase the vehicle from her friend." There is nothing inherently suspicious about a person driving a friend's vehicle, especially when that person has made arrangements to purchase the vehicle from the friend. I contrast these facts to those in *McClendon*, upon which the State relies:

> Trooper Lisenby lawfully stopped defendant and asked for his driver's license and registration. Defendant could not find the registration, and instead produced the title to the car. The title, however, was in the name of Jema Ramirez, instead of defendant's name. Trooper Lisenby was entitled to inquire further regarding the ownership of the car to determine whether it was stolen. It was defendant's responses to questions asked during such inquiry

that aroused Lisenby's, and later Sergeant Cardwell's, suspicions that criminal activity was afoot.

> Upon reviewing the evidence and the trial court's findings, we find several factors that gave rise to reasonable suspicion under the totality of the circumstances. First, when asked who owned the car, defendant said his girlfriend, but would not give Trooper Lisenby her name. It was only after defendant had been asked several times that he said his girlfriend "Anna" owned the car. When Trooper Lisenby inquired "Anna?" defendant said "I think so." However, "Anna" was not the name listed on the title as the owner of the car. Second, although defendant seemed unsure of who owned the car, the address of the owner listed on the title and the address on defendant's driver's license were the same, which would seem to indicate that they both lived in the same residence. Third, defendant was extremely nervous, sweating, breathing rapidly, sighing heavily, and chuckling nervously in response to questions. He also refused to make eye contact when answering questions. We conclude that these facts, when viewed in the totality of the circumstances, allowed the officers to form a reasonable suspicion that criminal activity was afoot.

*McClendon*, 350 N.C. at 637, 517 S.E.2d at 133. I do not find the facts in the present case to be analogous to those in *McClendon*; and the facts in this case provide far less than those in *McClendon* in support of a finding of reasonable suspicion.

I find that the facts in the present case are more analogous to those in *State v. Pearson*, 348 N.C. 272, 498 S.E.2d 599 (1998); *Myles*, 188 N.C. App. 42, 654 S.E.2d 752; and *Falana*, 129 N.C. App. 813, 501 S.E.2d 358, where our appellate courts reversed the denial of the defendants' motions to suppress, and remanded for the trial courts to vacate the judgments entered. The majority finds *Falana* and *Myles* distinguishable. Our Court in *Falana* relied on *Pearson* in reaching its holding. In *Pearson*, the following facts were relied upon to support the officer's reasonable suspicion:

> [The officer] observed that the defendant was nervous and had a rapid heart rate. . . . The defendant told Trooper Cardwell that he had had little sleep the previous night. He said that he and his fiancée had left the Charlotte area the day before and spent the night at his parents' home near the Virginia state line.

> Trooper Cardwell next spoke with the defendant's fiancée in the defendant's car while the defendant remained seated in the patrol

car. She said that the couple had spent the previous night in New York visiting the defendant's parents. On each trip to and from the defendant's car, Trooper Cardwell looked into the car for drugs or weapons. He saw nothing suspicious.

*Pearson*, 348 N.C. at 274, 498 S.E.2d at 599.

We cannot hold that the circumstances considered as a whole warrant a reasonable belief that criminal activity was afoot or that the defendant was armed and dangerous. The defendant was stopped at 3:00 p.m. on an interstate highway. Both officers testified that he was polite and cooperative. He had a slight odor of alcohol but not enough to be charged with driving while impaired. This should not give rise to a reasonable suspicion of criminal activity.

The nervousness of the defendant is not significant. Many people become nervous when stopped by a state trooper. The variance in the statements of the defendant and his fiancée did not show that there was criminal activity afoot. The officers testified the defendant was frisked because it was standard procedure to do so when a vehicle is searched.

The officers had never before encountered the defendant. They were not aware of any criminal record or investigation for drugs pertaining to him. The defendant was polite and cooperative. The bundle in his pants was not obvious and was not noticed by either officer.

*Id.* at 276, 498 S.E.2d at 600-01. Unlike in the case before us, the defendant in *Pearson* and his fiancée clearly gave conflicting statements concerning where they had spent the previous night. The defendant in *Pearson* was found to have been nervous and to have had a rapid heart rate. Nervousness was not a factor in the trial court's findings of fact in the present case. As in *Pearson*, Sergeant Cass had no outside information concerning Defendant or Ms. Perez to suggest they might be involved in criminal activity. Sergeant Cass, though making multiple trips between Ms. Perez and the SUV never noticed any suspicious items on Defendant, on Ms. Perez, or in the SUV.

In *Myles* our Court held that signs of extreme nervousness—the driver's "heart was beating unusually fast[;]" and the driver "was sweating profusely and wiped his hands on his pants, despite the fact it was a cool day and [the officer] had the air conditioner running in his car"—and arguably inconsistent stories given by the defendant and his cousin, were not sufficient to give rise to a reasonable suspi-

cion. *Myles*, 188 N.C. App. at 43-44, 50-51, 654 S.E.2d at 753-54, 58. In rejecting the argument that contradictory statements existed, our Court stated:

> However, Gilmore's [the arresting officer's] testimony revealed defendant and Croon's [the defendant's cousin's] stories were not contradictory. Gilmore testified as follows:
>
> Q:  But did you make an issue of the fact that the [rental] car was late being turned in as being one of your concerns?
>
> A:  Yes, sir, I just asked [Croon]. I said the car was supposed to be back yesterday, and he said well, he called and extended it, which is nothing uncommon.
>
> . . . .
>
> Q:  And what did you discuss with [the defendant]?
>
> A:  . . . I also asked him as far as the extension on the rental agreement. [Defendant] told me he had extended it until the following Wednesday. . . . I believe that's basically the gist of the conversation with him.
>
> Q:  And your basis for searching the car for the determination you made to search the car was exactly what?
>
> A:  . . . [Croon] was asked how long they would be staying in Fayetteville, he told me that—he initially told me about a week. When he told me that, he kind of looked down. . . . And throughout that conversation he told me that he was going to be looking for employment there and he may be staying if he did find it. When I questioned [the defendant] about the rental agreement as far as the length of the stay and when the rental agreement or the rental car was supposed to be turned back in, when he told me—first he told me it was supposed to be back on Wednesday, but then he told me he was supposed to stay for a week.
>
> Thus, both [the] defendant and Croon told Gilmore the rental agreement had been extended until the following Wednesday. Croon told Gilmore initially they were staying in Fayetteville a week but then later said he *may* stay longer if he found employment. [The defendant] corroborated Croon's story by saying they were "supposed to stay [in Fayetteville] for a week."

*Id*. at 50-51, 654 S.E.2d at 758. I find the "inconsistencies" argued by the majority to be analogous to the "inconsistencies" argued and discounted in *Myles*. Defendant and Ms. Perez stated they were cousins, then clarified that they just called each other cousins. Ms. Perez stated that they were coming from Houston, and that she did not know their destination, but Defendant did. Defendant corroborated this information through her own statements and actions. In the present case, there was no finding of nervousness, much less a finding of extreme nervousness, and only superficially contradictory statements that were later clarified by subsequent events.

The first finding in support of the trial court's conclusion was the reason for the stop itself—Sergeant Cass "observed a white SUV with what appeared to be illegally tinted windows." When considered in context, Ms. Perez's uncertainty concerning their destination, Defendant's statement that she and Ms. Perez were cousins, immediately followed by her explanation that they were not actually related by blood but were so close that they called each other cousins, the fact that the SUV was owned by a third party, and the apparently "illegally tinted windows," do not support a conclusion that reasonable suspicion existed that criminal activity might be afoot. When all of the trial court's relevant findings of fact are considered, I would hold they do not support its conclusion that a reasonable suspicion existed justifying the extended detention of Defendant. I would reverse the trial court's denial of Defendant's motion to suppress.