STATE OF NORTH CAROLINA v. TOMMIE EARL MYLES

No. COA07-118

(Filed 15 January 2008)

**Searches and Seizures— traffic stop—justification— nervousness**

A motion to suppress was erroneously denied, and the resulting guilty plea to trafficking in marijuana was ordered vacated, where a traffic stop resulted in the discovery of marijuana in the trunk of a car driven by defendant. The stop was for weaving, but the purpose of the stop was fulfilled with no evidence of violations, and further detention required suspicion based solely on information obtained during the lawful stop. Viewed through the eyes of a reasonable, cautious officer, the only suspicious fact was nervousness, but nervousness alone has not been held sufficient for reasonable suspicion. Since the continued detention was unconstitutional, defendant's consent to a search was not voluntary.

Judge McCULLOUGH dissenting.

Appeal by defendant from judgment entered 24 October 2006 by Judge J. Marlene Hyatt in Haywood County Superior Court. Heard in the Court of Appeals 19 September 2007.

*Attorney General Roy Cooper, by Assistant Attorney General John P. Scherer II, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Constance E. Widenhouse, for defendant-appellant.*

CALABRIA, Judge.

Tommie Earl Myles ("defendant") pled guilty to trafficking in marijuana and reserved his right to appeal the denial of his motion to suppress. Defendant appeals from the judgment. We reverse and remand.

**STATE v. MYLES**

[188 N.C. App. 42 (2008)]

The pertinent facts are summarized as follows: On 6 March 2005, Officer Brandon Gilmore ("Gilmore"), a K-9 officer with the Waynesville Police Department, participated in a joint law enforcement effort to enforce traffic violations on Interstate 40. Gilmore responded to a request for assistance from another officer and proceeded east towards Exit 20 of Interstate 40. As Gilmore approached Exit 20, he noticed a white vehicle weaving in its travel lane. As Gilmore passed the white vehicle, it weaved toward his lane. As the white vehicle approached Exit 20, it ran slightly off the road to the right. Gilmore noticed the driver looking into his rear and passenger mirrors and initiated a traffic stop. Gilmore did not videotape or audiotape the traffic stop.

Defendant's cousin, Sheraod Croon ("Croon"), drove the vehicle and defendant sat in the passenger seat. After Gilmore identified himself, he informed defendant and Croon the reason for the stop. When Gilmore asked Croon for his driver's license and registration, he learned the vehicle was a rental. Since defendant had rented the vehicle, Gilmore also requested and received defendant's driver's license. Gilmore did not detect an odor of alcohol. Gilmore told them to be more careful and issued a warning ticket. Gilmore then asked Croon to come to his police car so he could write the warning ticket. As Gilmore and Croon walked to the police car, Gilmore frisked Croon. During the frisk, Gilmore did not find any weapons or contraband, however, he noticed Croon's heart was beating unusually fast.

During the time Croon was in Gilmore's patrol car, Gilmore noticed Croon was sweating profusely and wiped his hands on his pants, despite the fact it was a cool day and Gilmore had the air conditioner running in his car. At some point in the conversation, Croon told Gilmore they were headed to Fayetteville to visit defendant's sick mother. When Gilmore asked Croon how long he would be in Fayetteville, Croon looked down and said a week.

Gilmore then left Croon and stepped out to talk with defendant, but did not tell Croon he was free to leave. Gilmore approached defendant, and spoke with him about the rental agreement. Defendant said he had extended the rental agreement until Wednesday. He also said they were going to Fayetteville to visit defendant's sick mother and were going to stay a week. Gilmore asked defendant how they intended to return the rental car on Wednesday in Nashville, if they were staying in Fayetteville for a week. Defendant hesitated, looked away, and then told Gilmore that

STATE v. MYLES

[188 N.C. App. 42 (2008)]

he would renew the rental agreement. As Gilmore looked down at defendant, he noticed defendant's heart beating through his shirt.

Gilmore then returned to his patrol car with Croon still seated in the vehicle. Gilmore told Croon that he was suspicious of their stories, and he called Trooper Herndon ("Herndon") of the North Carolina Highway Patrol for assistance. Croon and defendant gave Gilmore written consent to search the car. Gilmore told defendant that he would walk the canine around the car and then the canine would search the inside of the car. Gilmore testified they did not limit their consent. However, both defendant and Croon testified they orally limited their consent to allow only a search of the outside of the car.

Gilmore walked to the car, removed the keys from the ignition, and visually checked inside the car for potential dangers to the canine. Gilmore looked inside the trunk, moved a coat, and saw packages wrapped in cellophane that appeared to contain narcotics due to their size and the bulk. Gilmore then asked Herndon to arrest defendant. After securing both Croon and defendant, the officers found marijuana in the trunk.

Defendant was indicted on charges of trafficking in marijuana. At trial, defendant moved to suppress the evidence that was seized as a result of the search of defendant's rental car. The trial court denied his motion to suppress. Defendant pled guilty to trafficking in marijuana and reserved his right to appeal the denial of his motion to suppress. Defendant was sentenced to a minimum of 25 months to a maximum of 30 months in the North Carolina Department of Correction. Defendant appeals.

On appeal, defendant argues the trial court erred by denying his motion to suppress. He contends Gilmore lacked reasonable suspicion to detain him after completing the traffic stop, thereby violating his federal and state constitutional rights to be free from unreasonable searches and seizures. We reverse and remand.

On review of a motion to suppress:

An appellate court accords great deference to the trial court's ruling on a motion to suppress because the trial court is entrusted with the duty to hear testimony (thereby observing the demeanor of the witnesses) and to weigh and resolve any conflicts in the evidence. Our review of a trial court's denial of a motion to suppress is strictly limited to a determination of whether [its] find-

ings are supported by competent evidence, and in turn, whether the findings support the trial court's ultimate conclusion. However, the trial court's conclusions of law are reviewed *de novo* and must be legally correct.

*State v. Hernandez*, 170 N.C. App. 299, 303-04, 612 S.E.2d 420, 423 (2005) (internal quotation marks omitted) (citations omitted).

"Generally, the scope of the detention must be carefully tailored to its underlying justification. Once the original purpose of the stop has been addressed, there must be grounds which provide a reasonable and articulable suspicion in order to justify further delay." *State v. Falana*, 129 N.C. App. 813, 816, 501 S.E.2d 358, 360 (1998) (citations omitted). To determine whether the officer had reasonable suspicion, it is necessary to look at the totality of the circumstances. *State v. McClendon*, 350 N.C. 630, 636, 517 S.E.2d 128, 133 (1999). "After a lawful stop, an officer may ask the detainee questions in order to obtain information concerning or dispelling the officer's suspicions." *Id.*, 350 N.C. at 636, 517 S.E.2d at 132. "[T]he return of documentation would render a subsequent encounter consensual only if a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information." *State v. Kincaid*, 147 N.C. App. 94, 99, 555 S.E.2d 294, 299 (quoting *United States v. Elliott*, 107 F.3d 810, 814 (10th Cir. 1997) (internal citation omitted) (internal quotation marks omitted)).

In the case *sub judice,* Gilmore stopped defendant's vehicle because the vehicle weaved in its lane, indicating the driver may be impaired. During the stop, Gilmore did not detect an odor of alcohol either in the car, on defendant, or on Croon. Gilmore described both of them as cooperative. Croon's license check revealed he had a valid license. Furthermore, Gilmore did not find any weapons or contraband on Croon. Because there was no evidence to indicate either Croon or defendant was impaired, Gilmore considered the traffic stop "completed" because he had "completed all [his] enforcement action of the traffic stop." Therefore, in order to justify Gilmore's further detention of defendant, Gilmore must have had defendant's consent or "grounds which provide a reasonable and articulable suspicion in order to justify further delay" *before* he questioned defendant. *Falana*, 129 N.C. App. at 816, 501 S.E.2d at 360.

In order to determine whether Gilmore's further questioning of defendant and Croon was a detention or a consensual encounter, it is necessary to look at the totality of the circumstances. *McClendon,*

350 N.C. at 636, 517 S.E.2d at 133. Gilmore asked Croon if he would mind if he talked to defendant. Croon said he did not mind if Gilmore spoke to defendant. However, Gilmore testified that he never told Croon he was free to leave. In fact, Gilmore testified that Croon was not free to leave because he felt "there was more to the traffic stop than just failure to maintain a lane." Therefore, we conclude that defendant was detained when Gilmore questioned him and that defendant's encounter with Gilmore was not consensual. Since we have concluded that Gilmore detained Croon and defendant beyond the original justification for the traffic stop, we must determine whether Gilmore had "grounds which provide a reasonable and articulable suspicion in order to justify further delay." *Falana*, 129 N.C. App. at 816, 501 S.E.2d at 360.

Our Supreme Court has previously examined factors to determine whether a nonconsensual search of defendant's car was justified. *See State v. Pearson*, 348 N.C. 272, 275, 498 S.E.2d 599, 600 (1998). In *Pearson*, the officer stopped defendant on an interstate highway. *Id.*, 348 N.C. at 276, 498 S.E.2d at 600-01. The officer detected an odor of alcohol, defendant acted nervous and excited, and he made statements inconsistent with those of the passenger regarding their whereabouts the night before. *Id.*, 348 N.C. at 275, 498 S.E.2d at 600. The Court held, "the circumstances . . . did not justify a nonconsensual search of defendant's person." *Id.*, 348 N.C. at 276, 498 S.E.2d at 601. The Court said, "the nervousness of the defendant is not significant. Many people become nervous when stopped by a state trooper. The variance in the statements of the defendant and his fiancee did not show that there was criminal activity afoot." *Id.*

However, in *State v. McClendon*, our Supreme Court clarified *Pearson*. In *McClendon*, the Court held that "[n]ervousness, like all other facts, must be taken in light of the totality of the circumstances . . . nervousness is an appropriate factor to consider when determining whether a basis for a reasonable suspicion exists." *McClendon*, 350 N.C. at 638, 517 S.E.2d at 134. In affirming the trial court's denial of defendant's motion to suppress, the Court distinguished *Pearson* from *McClendon*. *Id.*, 350 N.C. at 638-39, 517 S.E.2d at 134. The Court held:

> In the case before us, however, defendant exhibited more than ordinary nervousness; defendant was fidgety and breathing rapidly, sweat had formed on his forehead, he would sigh deeply, and he would not make eye contact with the officer. This, taken

in the context of the *totality of the circumstances* found to exist by the trial court, gave rise to a reasonable suspicion that criminal activity was afoot.

*Id.*, 350 N.C. at 639, 517 S.E.2d at 134 (emphasis added).

In the case *sub judice*, it is necessary to determine whether the "totality of the circumstances" gave rise "to a reasonable articulable suspicion that criminal activity was afoot" to justify Gilmore's further detention of defendant. *Id.* "To determine reasonable articulable suspicion, courts 'view the facts through the eyes of a reasonable, cautious officer, guided by his experience and training' at the time he determined to detain defendant." *State v. Bell*, 156 N.C. App. 350, 354, 576 S.E.2d 695, 698 (2003) (quoting *State v. Munoz*, 141 N.C. App. 675, 682, 541 S.E.2d 218, 222 (2001) (internal citations omitted) (internal quotation marks omitted)).

When Gilmore stopped defendant's vehicle, he did not detect an odor of alcohol in the vehicle. When Gilmore frisked Croon, he found no contraband or weapons. However, as Gilmore frisked Croon, he noticed Croon's heart was beating unusually fast. Gilmore checked Croon's license and found no outstanding violations. Gilmore noticed the rental car was one day overdue. However, Gilmore did not suspect anything unusual about the rental agreement extension. The relevant testimony between Gilmore and defense counsel at trial went as follows:

Q: Now, the fact that the car was rented to [defendant] and [Croon] was driving it, was there anything illegal about that, sir?

A: Nothing illegal. It's just that he was the only one noted on the rental agreement. At the time when he rented the car, he would be the only one driving it. There's no law in North Carolina that I know of that would—

Q: And I believe you also noted on the rental agreement that the car was due back I believe the day before this incident?

A: Yes, sir, March 5th.

Q: Did you also note on the rental agreement that there was an option to keep the car to a maximum of seven days?

A: If you can point it out to me, I can probably agree with you. Yeah, max seven days, minimum of one day, yes, sir.

Q: But did you make an issue of the fact that the car was late being turned in as being one of your concerns?

A: Yes, sir, I just asked him. I said the car was supposed to be back yesterday, and he said well, he called and extended it, which is nothing uncommon.

Q: So there was nothing unusual then about having the car out beyond the due date?

A: Once he explained to me that he had called and extended the agreement, no, sir. I have heard of that taking place and I've actually had to do that myself.

According to the dissent, Gilmore's "legitimate investigation was not yet complete" when he learned the vehicle was a rental and one day overdue. In reaching this conclusion, the dissent relies on *U.S. v. Dorais*, 241 F.3d 1124 (9th Cir. 2001). However, *Dorais* is distinguishable from the case *sub judice*.

In *Dorais*, Laurie Gomes ("Gomes") rented a car from Dollar Rent-a-Car ("Dollar") that was due two days later. *Id.*, 241 F.3d at 1127. "[U]nder Hawaii law, a person who keeps a rental car for more than 48 hours after it is due commits a misdemeanor." *Id.*, 241 F.3d at 1130-31. Therefore, when the rental car was not returned four days after it was due, a Dollar employee notified police that the car was overdue. *Id.*, 241 F.3d at 1127. Based on the Dollar employee's complaint, a police officer stopped Gomes' car. *Id.* Gomes signed a consent for the police officer to search her purse, and the search yielded crystal methamphetamine. *Id.* In affirming the district court's denial of Gomes' motion to suppress the crystal methamphetamine, the Ninth Circuit held the police officer had reasonable suspicion to stop Gomes' car. *Id.*, 241 F.3d at 1131. In determining the police officer had reasonable suspicion to stop Gomes' car, the Ninth Circuit placed its emphasis on the fact that the police officer received a report from Dollar that a crime had been committed. *Id.* The police officer's justification for stopping Gomes' vehicle was based on the violation of a state statute. *Id.* The police officer had reasonable suspicion to stop Gomes' vehicle because the officer had received a report that Gomes had allegedly committed a misdemeanor for keeping the vehicle more than 48 hours after it was due. *Id.* In the instant case, unlike the officer in *Dorais*, Gilmore did not stop defendant's vehicle because a private business reported an overdue vehicle and the possibility that the driver of the vehicle had committed a crime. Rather, Gilmore stopped

defendant because the vehicle "was weaving within its traveling lane." It was only after Gilmore asked defendant and Croon for their driver's licenses that Gilmore learned the vehicle was a rental vehicle that was one day overdue. Furthermore, Gilmore testified that there was nothing unusual about defendant having possession of the rental vehicle one day beyond the due date.

Gilmore also testified that while he spoke to Croon in the patrol car, Croon appeared nervous throughout their interaction. Gilmore noticed Croon's heart was pounding, he was sweating profusely, and he averted his eyes during their conversation.

While our Supreme Court held in *McClendon* that a defendant's extreme nervousness may be taken into account in determining whether reasonable suspicion exists, here Croon's nervous behavior taken in the context of the totality of the circumstances does not rise to the level of reasonable suspicion necessary to justify Gilmore's further detention of defendant. In *McClendon*, Sergeant Cardwell ("Cardwell") noticed two cars traveling seven miles over the posted speed limit on Interstate 85 in Greensboro. *McClendon*, 350 N.C. at 632, 517 S.E.2d at 130. One vehicle was a minivan and following closely behind it was a station wagon driven by defendant. *Id.* Cardwell called for assistance and they stopped both vehicles. *Id.*, 350 N.C. at 633, 517 S.E.2d at 130. Trooper Lisenby questioned defendant who appeared nervous, did not make eye contact, and was breathing heavily. *Id.* Defendant did not have the registration for the vehicle. *Id.* He said that his girlfriend owned the car, but "could not give Trooper Lisenby her name even though the address on defendant's driver's license and the address on the title to the station wagon were the same." *Id.*, 350 N.C. at 633, 517 S.E.2d at 130-31.

Trooper Lisenby told defendant to get into his patrol car for further questioning. *Id.*, 350 N.C. at 633, 517 S.E.2d at 131. "Trooper Lisenby testified that as defendant answered the questions, his nervousness increased. Defendant was fidgety, evasive with his answers, and appeared very uncomfortable." *Id.* (quotation marks omitted). When Trooper Lisenby questioned defendant about the name on the car's registration, defendant mumbled something, which Trooper Lisenby thought was Anna. *Id.* A radio check revealed the name on the title to the station wagon was Jema Ramirez. *Id.* After issuing a warning ticket for speeding and following too closely, Trooper Lisenby asked defendant if he had any weapons or narcotics in the vehicle. *Id.*, 350 N.C. at 634, 517 S.E.2d at 131. "Defendant sighed

deeply, chuckled nervously, looked down, and finally muttered 'No.' "
*Id.* Trooper Lisenby then asked defendant for permission to search
the vehicle and defendant said no. *Id.* The Supreme Court held that
defendant's extreme nervousness *"taken in the context of the totality
of the circumstances* found to exist by the trial court, gave rise to a
reasonable suspicion that criminal activity was afoot." *Id.*, 350 N.C. at
638, 517 S.E.2d at 134 (emphasis added). In the case *sub judice*,
Gilmore testified he did not suspect anything unusual about the over-
due rental car and a check of Croon's license revealed no outstanding
violations. Thus, when we "view the facts through the eyes of a rea-
sonable, cautious officer," the only suspicious fact during the traffic
stop was Croon's nervous behavior. *Bell*, 156 N.C. App. at 354, 576
S.E.2d at 698. The single fact that Croon appeared very nervous, while
being questioned by a police officer, is not enough to "rise to a rea-
sonable suspicion that criminal activity was afoot." *McClendon*, 350
N.C. at 639, 517 S.E.2d at 134. Although our Supreme Court previously
has stated nervousness can be a factor in determining whether rea-
sonable suspicion exists, our Supreme Court has never said nervous-
ness alone is sufficient to determine whether reasonable suspicion
exists when looking at the totality of the circumstances.

Moreover, the trial court appeared to rely on information Gilmore
learned after he completed the traffic stop to justify further detaining
the defendant. The trial court found that when Gilmore questioned
defendant, he appeared extremely nervous, there were several cell
phones ringing, and his story contradicted Croon's story. The dissent
contends that "[o]ther courts are in accord and recognize nervous-
ness and differing stories as giving rise to reasonable suspicion."
However, Gilmore's testimony revealed defendant and Croon's stories
were not contradictory. Gilmore testified as follows:

Q: But did you make an issue of the fact that the car was late
being turned in as being one of your concerns?

A: Yes, sir, I just asked [Croon]. I said the car was supposed to be
back yesterday, and he said well, he called and extended it,
which is nothing uncommon.

. . . .

Q: And what did you discuss with [defendant]?

A: . . . I also asked him as far as the extension on the rental agree-
ment. [Defendant] told me he had extended it until the fol-

lowing Wednesday. . . . I believe that's basically the gist of the conversation with him.

. . . .

Q: And your basis for searching the car for the determination you made to search the car was exactly what?

A: . . . [Croon] was asked how long they would be staying in Fayetteville, he told me that—he initially told me about a week. When he told me that, he kind of looked down. . . . And throughout that conversation he told me that he was going to be looking for employment there and he may be staying if he did find it. When I questioned [defendant] about the rental agreement as far as the length of the stay and when the rental agreement or the rental car was supposed to be turned back in, when he told me—first he told me it was supposed to be back on Wednesday, but then he told me he was supposed to stay for a week.

Thus, both defendant and Croon told Gilmore the rental agreement had been extended until the following Wednesday. Croon told Gilmore initially they were staying in Fayetteville a week but then later said he *may* stay longer if he found employment. Defendant corroborated Croon's story by saying they were "supposed to stay [in Fayetteville] for a week."

Furthermore, Gilmore questioned defendant and observed defendant's nervousness *after* Gilmore considered the traffic stop complete. In order for Gilmore to lawfully detain defendant, Gilmore's suspicion must be based solely on information obtained during the lawful detention of Croon up to the point that the purpose of the stop has been fulfilled. *See generally Kincaid*, 147 N.C. App. at 94, 555 S.E.2d at 294; *McClendon*, 350 N.C. at 636, 517 S.E.2d at 134. Any information obtained during the improper detention cannot support the detention. Because the trial court did not specify in its conclusions of law which findings of fact were relied on in making its determination, we conclude that Gilmore unreasonably detained defendant. Since Gilmore's continued detention of defendant was unconstitutional, defendant's consent to the search of his car was involuntary. *See Florida v. Royer*, 460 U.S. 491, 75 L. Ed. 2d 229 (1983).

In conclusion, defendant was unconstitutionally detained and therefore the search of defendant's car was unlawful. We reverse and

remand to the Superior Court, Haywood County, to vacate defendant's guilty plea.

Reversed and remanded.

Judge STEPHENS concurs.

Judge McCULLOUGH dissents with a separate opinion.

McCULLOUGH, Judge, dissenting.

The majority has concluded that Officer Gilmore of the Waynesville Police Department improperly detained the driver of an automobile and his passenger, defendant herein, after a legitimate traffic stop had been concluded.

As I believe the driver's extreme nervousness provided the officer with reasonable suspicion that the men were engaged in criminal activity, the limited time he spent conducting further inquiry was proper. *State v. McClendon*, 350 N.C. 630, 638, 517 S.E.2d 128, 134 (1999).

In the case *sub judice*, Officer Gilmore was on patrol on I-40 when he noticed a car being operated in an erratic manner, weaving in its travel lane and toward his vehicle. The car then ran off the road to the right shoulder with the driver looking in his rearview mirror while observing the police car. It is conceded that the initial stop was thus proper.

The defendant passenger identified the vehicle as his rental car and provided the rental agreement to the officer. The officer and driver went to the patrol car so that the officer could check both parties' drivers licenses and look at the rental agreement. Officer Gilmore noted the rental agreement with the driver stated that only defendant was to operate the vehicle under the contract and that the car was overdue. The driver explained that defendant had extended the contract and that he did not know he was not supposed to operate the car. At some point, the driver told Officer Gilmore he was going to Fayetteville and why. Having determined that the drivers license was valid, Officer Gilmore then went to speak to defendant about the rental agreement.

At this point it was noticeable to the officer that the driver's heart was beating extremely fast. He also observed the driver was sweating profusely despite the fact that the temperature was 50°F.

**STATE v. MYLES**

[188 N.C. App. 42 (2008)]

As defendant was the renter of a vehicle that was overdue, it was reasonable for the officer to question him about the rental contract. Thus, despite the fact that the officer was finished with the driver, his legitimate investigation was not yet complete.

While defendant was explaining to Officer Gilmore the purpose of the trip (to visit his sick mother), the officer noticed defendant was also visibly nervous and could see his heart beating through his shirt.

Up until this point the officer was conducting a legitimate inquiry and seeking to satisfy himself that the vehicle was not overdue and was properly possessed and operated by defendant. In fact, the officer could have done more investigation and could have verified defendant's explanation, instead of merely accepting his story.

In any event, it was at this point that Officer Gilmore confronted defendant and the driver with their nervousness and their unlikely accounts of the trip. The majority concludes that once the driver was cited, the officer had no further right to investigate; and it is with this conclusion that I disagree.

Officer Gilmore was presented with a rental agreement that showed the car was overdue. Certainly he had the right to ask the actual renter (defendant) about what steps he had taken to maintain possession. *See U.S. v. Dorais,* 241 F.3d 1124 (9th Cir. 2001) (having reasonable suspicion to stop car reported as overdue by rental agency). Here the officer had a vehicle with a lease that showed it was overdue.

It was at the end of that process that the officer asked for and received the consent to search which resulted in the seizure at issue.

In *McClendon,* the trooper who stopped the defendant appeared nervous, was breathing heavily, was fidgety, evasive and appeared uncomfortable. During further questioning, the defendant in *McClendon* was breathing rapidly and sweating profusely.

Nervousness can be a factor as Chief Justice Mitchell noted in *McClendon* stating:

> Defendant stresses the fact that in *Pearson,* we said that "[t]he nervousness of the defendant is not significant. Many people become nervous when stopped by a state trooper." *Id.* at 276, 498 S.E.2d at 601. Although the quoted language from *Pearson* is

couched in rather absolute terms, we did not mean to imply there that nervousness can never be significant in determining whether an officer could form a reasonable suspicion that criminal activity is afoot. Nervousness, like all other facts, must be taken in light of the totality of the circumstances. It is true that many people do become nervous when stopped by an officer of the law. Nevertheless, nervousness is an appropriate factor to consider when determining whether a basis for a reasonable suspicion exists. *See Butler*, 331 N.C. 227, 415 S.E.2d 719; *see also United States v. Perez*, 37 F.3d 510, 514 (9th Cir. 1994) (nervousness and sweating profusely were among the factors giving rise to reasonable suspicion); *United States v. Nikzad*, 739 F.2d 1431, 1433 (9th Cir. 1984) (fact that defendant was nervous and failed to make eye contact gave rise to reasonable suspicion).

In *Pearson*, the nervousness of the defendant was not remarkable. Even when taken together with the inconsistencies in the statements of the defendant and his girlfriend, it did not support a reasonable suspicion. In the case before us, however, defendant exhibited more than ordinary nervousness; defendant was fidgety and breathing rapidly, sweat had formed on his forehead, he would sigh deeply, and he would not make eye contact with the officer. This, taken in the context of the totality of the circumstances found to exist by the trial court, gave rise to a reasonable suspicion that criminal activity was afoot.

*McClendon*, 350 N.C. at 638-39, 517 S.E.2d at 134.

Other courts are in accord and recognize nervousness and differing stories as giving rise to reasonable suspicion. *U.S. v. Williams*, 403 F.3d 1203, 1206-07 (10th Cir. 2005).

The principal disagreement with the majority conclusion concerns its determination that the only legitimate inquiry ended after citing the driver and that the officer had no right to prolong the stop and to investigate the overdue rental agreement. With this I disagree and therefore dissent.