NO. COA13-721

NORTH CAROLINA COURT OF APPEALS

Filed: 1 July 2014

STATE OF NORTH CAROLINA

   v.

ANTHONY DUWANE COTTRELL,
     Defendant.

Forsyth County
Nos. 12 CRS 6423
    12 CRS 6424
    12 CRS 55278

Appeal by defendant from judgment entered 11 February 2013 by Judge Susan E. Bray in Forsyth County Superior Court. Heard in the Court of Appeals 21 November 2013.

> *Attorney General Roy Cooper, by Associate Attorney General Gayle Kemp and Assistant Attorney General Joseph L. Hyde, for the State.*
>
> *Appellate Defender Staples Hughes, by Assistant Appellate Defender Katherine Jane Allen, for defendant-appellant.*

GEER, Judge.

Defendant Anthony Duwane Cottrell pled guilty to possession of a firearm by a felon, possession of a schedule II controlled substance, and possession of up to one-half ounce of marijuana. He also admitted being a habitual felon. On appeal, he contends that the trial court erred in denying his motion to suppress. He argues that he was unconstitutionally seized when the investigating officer extended a traffic stop after addressing

its original purpose without (1) a reasonable and articulable suspicion of criminal activity or (2) defendant's consent to being further detained. We agree with defendant and hold that, under *State v. Myles*, 188 N.C. App. 42, 654 S.E.2d 752, *aff'd per curiam*, 362 N.C. 344, 661 S.E.2d 732 (2008), because the officer continued to detain defendant after completing the original purpose of the stop without having reasonable, articulable suspicion of criminal activity, defendant was subjected to a seizure in violation of the Fourth Amendment. Since defendant's consent to the search of his vehicle, given during the unlawful seizure, was necessarily invalid, the trial court should have granted defendant's motion to suppress.

## Facts

At 11:37 p.m. on 28 May 2012, Officer Jordan Payne of the Winston-Salem Police Department observed defendant driving a Dodge Intrepid with the car's headlights off. Officer Payne initiated a traffic stop, and defendant pulled into a nearby parking lot. The dashboard video camera on Officer Payne's patrol car recorded the subsequent stop.

Officer Payne approached defendant's car and asked defendant, who was the car's sole occupant, for his license and registration. The officer told defendant that if everything checked out, defendant would soon be cleared to go. Defendant

did not smell of alcohol, he did not have glassy eyes, he was not sweating or fidgeting, and he made no contradictory statements to Officer Payne.

Officer Payne then returned to his patrol car, ran defendant's identification, and learned that defendant's license and registration were valid. Officer Payne also checked defendant's criminal history and learned that defendant had a history of "drug charges and various felonies." Officer Payne returned to defendant's car and asked defendant to keep his music down since the officer had heard loud music coming from either defendant's car or the car in front of defendant's car as they drove down the street.

While Officer Payne spoke to defendant, he smelled an extremely strong odor coming from defendant's car that the officer described as "like a fragrance, cologne-ish," but "more like an incense than what someone would wear." Officer Payne believed the odor was a "cover scent" -- a fragrance released in a vehicle to cover the smell of drugs like marijuana. Officer Payne asked defendant about the odor, and defendant showed him a small, clear glass bottle with some liquid in it and a roll-on dispenser. Defendant stated it was an oil he put on his body. Officer Payne told defendant that fragrances were typically used

to mask the odor of marijuana, but defendant claimed he was not trying to hide any odors.

Officer Payne, who still had possession of defendant's license and registration, then asked for consent to search defendant's car. When defendant refused to give consent, Officer Payne said defendant was not being honest with him and indicated he could call for a drug-detection dog to sniff defendant's car. Defendant replied that he did not want the officer to call for a dog and that he just wanted to go home. When Officer Payne insisted he was going to call for the dog, defendant then consented to a search of the car.

Officer Payne had defendant step out of the car and frisked defendant for weapons, finding none. Officer Payne began searching defendant's car at 11:41 p.m., roughly four minutes after he first observed defendant's car driving down the street. He looked first in the driver's side and then went around to the passenger's side. He removed the key from the ignition and unlocked the glove box with it. When the officer opened the glove box, a handgun and a baggy containing a white powdery substance, later determined to be cocaine, fell out. Officer Payne then placed defendant under arrest. After defendant was arrested, he admitted to Officer Payne that he had a small

baggie of marijuana in his sock. The officer never returned defendant's license and registration to defendant.

Defendant was indicted for possession of a firearm by a felon, possession of a schedule II controlled substance, possession of up to one-half ounce of marijuana, and being a habitual felon. Defendant filed a motion to suppress on 30 January 2013 and an amended motion to suppress on or about 4 February 2013.

At a 5 February 2013 hearing on the motion to suppress, the State presented the testimony of Officer Payne and the video and audio recording of the stop taken by the patrol car's dashboard camera. Defendant testified in support of his motion. After the trial court denied the motion to suppress, defendant pled guilty to the charges and admitted being a habitual felon. The trial court consolidated the charges into a single judgment and sentenced defendant to a mitigated-range term of 76 to 104 months imprisonment. After entry of the judgment, defendant gave oral notice of appeal from the denial of his motion to suppress and filed written notice of appeal.

I

We must initially address this Court's jurisdiction over this appeal. "An order finally denying a motion to suppress evidence may be reviewed upon an appeal from a judgment of

conviction, including a judgment entered upon a plea of guilty." N.C. Gen. Stat. § 15A-979(b) (2013). Our Supreme Court has held that "when a defendant intends to appeal from the denial of a suppression motion pursuant to this section, he must give notice of his intention to the prosecutor and to the court before plea negotiations are finalized; otherwise, he will waive the appeal of right provisions of the statute." *State v. Tew*, 326 N.C. 732, 735, 392 S.E.2d 603, 605 (1990). Further, since "[a] Notice of Appeal is distinct from giving notice of *intent* to appeal" the denial of a motion to suppress, a defendant who has properly preserved his right to appeal the denial of a suppression motion must also properly appeal the subsequent judgment pursuant to Rule 4 of the Rules of Appellate Procedure. *State v. McBride*, 120 N.C. App. 623, 625, 463 S.E.2d 403, 405 (1995), *aff'd per curiam*, 344 N.C. 623, 476 S.E.2d 106 (1996).

In other words, in order to properly appeal the denial of a motion to suppress after a guilty plea, a defendant must take two steps: (1) he must, prior to finalization of the guilty plea, provide the trial court and the prosecutor with notice of his intent to appeal the motion to suppress order, and (2) he must timely and properly appeal from the final judgment. In this case, defendant concedes that he did not properly give the

required notice of his intent to appeal the denial of his motion to suppress.[1]

Defendant has, however, filed a petition for writ of certiorari with this Court to which he has attached affidavits from his trial counsel and the prosecutor, both of which indicate that defense counsel gave the prosecutor verbal notice that if the motion to suppress was denied, defendant would enter a plea of guilty and appeal the denial of the motion to suppress. In addition, during the plea colloquy, defense counsel generally advised the trial court of defendant's intent to appeal without referencing the motion to suppress.

The State has filed a motion to dismiss defendant's appeal, asserting that there is no dispute that defendant waived his right to appeal by failing to properly give notice of his intent to appeal the denial of his suppression motion. Based on defendant's concession, we grant that motion and dismiss defendant's appeal. *See McBride*, 120 N.C. App. at 625, 626, 463 S.E.2d at 405 (dismissing appeal from denial of suppression motion followed by guilty plea for failure to properly give

---

[1]We note that the record does contain some notice of defendant's intent to appeal prior to entry of the guilty plea, but since defendant has not argued that the notice given was adequate, we do not address that issue. *See Viar v. N.C. Dep't of Transp.*, 359 N.C. 400, 402, 610 S.E.2d 360, 361 (2005) ("It is not the role of the appellate courts . . . to create an appeal for an appellant.").

State and trial court notice of intent to appeal denial of suppression motion). Nevertheless, because it is apparent that the State was aware of defendant's intent to appeal the denial of the motion to suppress prior to the entry of defendant's guilty pleas and because defendant has lost his appeal through no fault of his own, we exercise our discretion to grant the petition for writ of certiorari and address the merits of defendant's appeal. *See State v. Atwell*, 62 N.C. App. 643, 645, 303 S.E.2d 402, 404 (1983) (dismissing appeal but issuing writ of certiorari to reach merits of defendant's appeal from denial of suppression motion since, although record did not demonstrate proper notice of intent to appeal, "[t]here [was] at least some evidence that the district attorney's office and the Court had notice of a possible appeal of the denial of the suppression motion before the guilty plea").

## II

Defendant's sole argument on appeal is that the trial court erred in denying his motion to suppress. Defendant contends that, while the traffic stop was valid, Officer Payne violated the Fourth Amendment when he detained defendant further after determining that defendant's license and registration were valid and defendant had no outstanding warrants. Defendant argues that Officer Payne had no reasonable, articulable suspicion of

criminal activity sufficient to justify detaining defendant once the purpose of the traffic stop was completed.

Our review of a trial court's denial of a motion to suppress is "strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law." *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). "The trial court's conclusions of law . . . are fully reviewable on appeal." *State v. Hughes*, 353 N.C. 200, 208, 539 S.E.2d 625, 631 (2000).

Defendant does not challenge any of the trial court's findings of fact and they are, therefore, binding on this Court. *See State v. Robinson*, 187 N.C. App. 795, 797, 653 S.E.2d 889, 891 (2007) (explaining that unchallenged findings of fact are "conclusive and binding on appeal"). Defendant, however, challenges the following conclusions of law made by the trial court:

> 3. Generally, an initial stop concludes after the officer returns the detainee's license and registration. *State v. Jackson*, 199 N.C. App. 236[, 681 S.E.2d 492] (2009)[;] *State v. Kincaid*, 147 N.C. App. 94[, 555 S.E.2d 294] (2001). In this case, because the initial seizure had not concluded (no return of Defendant Cottrell's license), a [*State v.*] *McClendon*[, 350

> N.C. 630, 517 S.E.2d 128 (1999)] analysis about developing reasonable, articulable suspicion that criminal activity is afoot is inapplicable. . . .
>
> . . . .
>
> 5. Officer Payne was going to call for a dog to sniff Defendant Cottrell's car. This was permissible, so long as dog [sic] would get there in under five minutes. However, Defendant then consented to search.
>
> 6. Defendant's consent was not coerced. Officer Payne was not threatening something (a dog sniff) he didn't have the right to do. The threat to do what an officer has a legal right to do does not constitute duress. It is not duress to take any measure authorized by law and the circumstances of the case. . . .

This Court has held that, "'[g]enerally, the scope of the detention must be carefully tailored to its underlying justification. Once the original purpose of the stop has been addressed, there must be grounds which provide a reasonable and articulable suspicion in order to justify further delay.'" *Myles*, 188 N.C. App. at 45, 654 S.E.2d at 754 (quoting *State v. Falana*, 129 N.C. App. 813, 816, 501 S.E.2d 358, 360 (1998)). We must, therefore, first address whether the initial purpose of the stop was completed prior to the time defendant gave consent to search.

In *Myles*, the officer conducted a traffic stop for weaving, indicating possible impaired driving. *Id.*, 654 S.E.2d at 755. The car stopped by the officer was rented by the defendant passenger. *Id.* at 43, 654 S.E.2d at 753. During the stop, the officer detected no odor of alcohol and described the driver and the defendant as cooperative. *Id.* at 45, 654 S.E.2d at 755. The officer did not find any weapons or contraband on the driver when he frisked him, and the driver had a valid driver's license. *Id.* The officer issued a warning ticket. *Id.* at 43, 654 S.E.2d at 753. The officer then proceeded to question the defendant, separately from the driver, about his travel plans and the rental car agreement. *Id.*, 654 S.E.2d at 754.

On appeal, this Court in *Myles* observed that since there was no evidence to indicate that either the driver or the defendant was impaired, the officer "considered the traffic stop 'completed' because he had 'completed all [his] enforcement action of the traffic stop.'" *Id.* at 45, 654 S.E.2d at 755. The Court, therefore, held that "in order to justify [the officer's] further detention of defendant, [the officer] must have had defendant's consent or 'grounds which provide a reasonable and articulable suspicion in order to justify further delay' *before* he questioned defendant." *Id.* (quoting *Falana*, 129 N.C. App. at 816, 501 S.E.2d at 360).

Here, the trial court has misapplied this Court's decisions in *Jackson* and *Kincaid*. In each of those cases, this Court held that once an officer returned the defendant's license and registration, the seizure had ended because the defendant was free to go, and any further communications between the officer and the defendant were, as a result, consensual. *See Jackson*, 199 N.C. App. at 243, 681 S.E.2d at 497 ("Generally, an initial traffic stop concludes and the encounter becomes consensual only after an officer returns the detainee's driver's license and registration."); *Kincaid*, 147 N.C. App. at 100, 555 S.E.2d at 299 ("A reasonable person, under the circumstances, would have felt free to leave when [his license and registration] were returned. Therefore, the first seizure concluded when [the officer] returned the documents to defendant.").

While *Jackson* and *Kincaid* hold that return of a person's license and registration may mean that the traffic stop has concluded, nothing in *Jackson* and *Kincaid* suggests that the officer may prolong a traffic stop, after the original purpose of the stop has been completed, simply by not returning the driver's documentation. Indeed, *Jackson* sets out the applicable rule overlooked by the trial court: "Once the original purpose of the stop has been addressed, in order to justify further delay, there must be grounds which provide the detaining officer

with additional reasonable and articulable suspicion or the encounter must have become consensual." *Jackson*, 199 N.C. App. at 241-42, 681 S.E.2d at 496.

The trial court erred, therefore, in basing its decision on the premise that because the officer had not yet returned defendant's license, the underlying purpose of the stop was not yet complete, and the officer could continue to detain defendant. *See also State v. Jarrett*, 203 N.C. App. 675, 676, 682-83, 692 S.E.2d 420, 422, 426 (2010) (holding initial purpose for stop at checkpoint "was addressed when defendant produced a valid North Carolina driver's license and registration" even though that occurred "[b]efore [the officer] return[ed] defendant's documentation").

Turning to the question of when Officer Payne completed the purpose of the underlying stop in this case, the trial court found that Officer Payne had observed defendant driving without headlights and that the officer, during the stop, had told defendant to keep his music down because "he had heard loud music from either Defendant's car or the one in front of Defendant as they drove down Trade Street, and that this would violate a local noise ordinance." For the purposes of our analysis, we assume that Officer Payne stopped defendant for

both the headlights infraction and the potential noise violation.

With respect to the two reasons given for the officer's stop, the trial court found that defendant had turned his headlights on before he actually stopped and that defendant told the officer he realized his headlights had not been on and apologized for having them off. The trial court found that upon taking defendant's license and registration, Officer Payne told defendant that "if everything checked out, he would be [sic] soon be cleared to go." Officer Payne then determined that defendant's license and registration were valid and defendant had no outstanding warrants. When the officer returned to defendant's car, the officer asked defendant to make sure to keep his music down because of the noise ordinance. The officer then smelled a strong fragrance, and all of the officer's questions and statements after that point had to do with the fragrance, whether defendant had drugs in the car, whether defendant would consent to a search, and whether the officer was going to call for a drug-sniffing dog.

Given the facts found by the trial court, we hold that once Officer Payne told defendant to keep his music down, the officer had completely addressed the original purpose for the stop. Defendant had turned on his headlights, he had been warned about

his music, his license and registration were valid, and he had no outstanding warrants. Consequently, Officer Payne was then required to have "defendant's consent or 'grounds which provide a reasonable and articulable suspicion in order to justify further delay' *before*" asking defendant additional questions. *Myles*, 188 N.C. App. at 45, 654 S.E.2d at 755 (quoting *Falana*, 129 N.C. App. at 816, 501 S.E.2d at 360).

The trial court erred in concluding otherwise. *See also Jackson*, 199 N.C. App. at 242, 681 S.E.2d at 496-97 (holding stop was unlawfully extended beyond original purpose of determining whether driver had valid driver's license when, after officer had dispelled suspicion of invalid license, she asked driver whether there was anything illegal in vehicle).

Turning next to whether Officer Payne had a reasonable and articulable suspicion of criminal activity in order to extend the stop beyond its original scope, our Supreme Court has explained:

> Reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence. The standard is satisfied by some minimal level of objective justification. This Court requires that [t]he stop . . . be based on specific and articulable facts, as well as the rational inferences from those facts, as viewed through the eyes of a reasonable, cautious officer, guided by his experience and training. Moreover, [a] court must

> consider the totality of the circumstances -
> - the whole picture in determining whether a
> reasonable suspicion exists.

*State v. Styles*, 362 N.C. 412, 414, 665 S.E.2d 438, 439-40 (2008) (internal citations and quotation marks omitted). In addition, "[t]he requisite degree of suspicion must be high enough 'to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field.'" *State v. Fields*, 195 N.C. App. 740, 744, 673 S.E.2d 765, 767 (2009) (quoting *State v. Murray*, 192 N.C. App. 684, 687, 666 S.E.2d 205, 208 (2008)).

Here, the trial court found that as of the time Officer Payne told defendant about the noise ordinance, the officer knew that defendant's license and registration were valid, defendant had no outstanding warrants, defendant had turned his headlights back on prior to being stopped and had apologized, defendant had no odor of alcohol or glassy eyes, defendant was not sweating or fidgeting, and defendant did not make contradictory statements. The court also found that Officer Payne knew defendant "had a history of 'drug charges and various felonies'" and the officer, upon speaking with defendant after checking defendant's documents, "noticed an extremely strong odor coming from the vehicle." The trial court found that the officer "described it

as 'like a fragrance, cologne-ish, strong[,]'" and "more like an incense than what someone would wear." Officer Payne also "believed the odor was what is commonly referred to as a cover scent -- a fragrance or air freshener typically sprayed or released in a vehicle to mask or cover the smell of drugs like marijuana."

Based on these findings, the trial court noted that, "[f]or argument's sake," it "would find that Officer Payne did not have reasonable, articulable suspicion that criminal activity was afoot -- mere cologne odor and previous felony conviction aren't enough." The court further noted there was "[n]o evidence of extreme nervousness, failure to maintain eye contact, [or] conflicting stories about registration[] [or] destination," and there were "no invalid documents."

We agree with the trial court that a strong incense-like fragrance, which the officer believes to be a "cover scent," and a known felony and drug history are not, without more, sufficient to support a finding of reasonable suspicion of criminal activity. Instead, our case law tends to show that some additional evidence of criminal activity is necessary for an officer to develop a reasonable and articulable suspicion. *Compare Myles*, 188 N.C. App. at 47, 50, 51, 654 S.E.2d at 756, 758 (holding no reasonable suspicion existed to extend traffic

stop when rental car occupants' stories did not conflict, there was no odor of alcohol, officer found no contraband or weapons upon frisking driver, and driver's license was valid, despite fact that driver's "heart was beating unusually fast" and rental car was one day overdue), *Jackson*, 199 N.C. App. at 242-43, 681 S.E.2d at 497 (holding officer did not have reasonable suspicion to extend traffic stop when "occupants of the vehicle had been cooperative with the officers throughout the stop," officer "confirmed 'there were no problems with any of these folks'" while checking validity of driver's license, and "there were no pending warrants for any of the vehicle's occupants"), *State v. Sinclair*, 191 N.C. App. 485, 491, 663 S.E.2d 866, 871 (2008) (holding no reasonable suspicion existed where only facts tending to show criminal activity were that officers "'received information about drug activity[,]'" "scene of the attempted stop was a known drug activity area," and officer "had made prior drug arrests in the area") *with State v. Fisher*, ___ N.C. App. ___, ___, 725 S.E.2d 40, 45 (2012) (holding reasonable suspicion present based on defendant's nervousness, "smell of air freshener, inconsistency with regard to travel plans," and "driving a car not registered to the defendant"), *cert. denied*, ___ U.S. ___, 187 L. Ed. 2d 279, 134 S. Ct. 420 (2013); *State v. Euceda-Valle*, 182 N.C. App. 268, 274-75, 641 S.E.2d 858, 863

(2007) (holding reasonable suspicion present based on defendant's extreme nervousness, refusal to make eye contact, smell of air freshener from vehicle, and conflict in defendant's and passenger's stories about their trip), *and State v. Hernandez*, 170 N.C. App. 299, 309, 612 S.E.2d 420, 426, 427 (2005) (holding reasonable suspicion present based on defendant's acting "'very nervous,'" defendant giving conflicting statements, and trooper's observation of several air fresheners in vehicle giving off "'strong odor'").

Thus, the trial court correctly determined that Officer Payne did not have reasonable, articulable suspicion to extend the traffic stop after the original purposes for the stop had been completely addressed. We note that although the State does not expressly challenge the trial court's determination that Officer Payne did not have reasonable suspicion to extend the stop, the State does argue that, given the court's findings about the fragrance and the loud music, the officer's "observations . . . required investigation" and that "Officer Payne would have been remiss in his duties had he not asked questions to complete his investigation." To the extent that the State contends that the officer could, under the circumstances of this case, continue to question defendant in the absence of reasonable suspicion or consent, the State's

argument is foreclosed by *Myles* and the Supreme Court's decision in *State v. Williams*, 366 N.C. 110, 116, 726 S.E.2d 161, 166 (2012) ("[T]o detain a driver beyond the scope of the traffic stop, the officer must have the driver's consent or reasonable articulable suspicion that illegal activity is afoot.").

Since Officer Payne did not have reasonable suspicion to extend the stop, we next address whether defendant consented to further detention after Officer Payne had fully addressed the initial purpose of the stop. The trial court concluded that up until the time defendant consented to the search, he remained seized by Officer Payne. In support of its conclusion, the trial court found that Officer Payne never returned defendant's license. The court also found that defendant denied consent to search, indicated he did not want the officer to call a drug dog, and "told the officer he just wanted to go home." Further, defendant "confirmed he didn't get his license back and never felt free to leave." The State does not contend that defendant was free to leave at any point.

"Generally, an initial traffic stop concludes and the encounter becomes consensual only after an officer returns the detainee's driver's license and registration." *Jackson*, 199 N.C. App. at 243, 681 S.E.2d at 497. Indeed, at times, even the return of documentation is not sufficient to make further

detention during a traffic stop consensual. *See id.* ("'Furthermore, the return of documentation would render a subsequent encounter consensual *only if* a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information.'" (quoting *Kincaid*, 147 N.C. App. at 99, 555 S.E.2d at 299)).

Since defendant was not given his license back; defendant was not told he could leave; defendant was continuously questioned by the officer after the original purpose for the stop had been addressed until defendant ultimately consented to a search, despite defendant's statements that he wanted to go home and that he did not want a drug dog called; and defendant was told the officer was going to call a drug dog to sniff defendant's car, the trial court correctly found that defendant's detention never became consensual in this case. *See id.* ("As a reasonable person under the circumstances would certainly not believe he was free to leave without his driver's license and registration, [the officer's] continued detention and questioning of [the driver] after determining that [the driver] had a valid driver's license was not a consensual encounter.").

Recognizing that defendant remained seized throughout the encounter and that Officer Payne did not have reasonable,

articulable suspicion that defendant was engaged in criminal activity, the trial court concluded, and the State argues on appeal, that this case is controlled by this Court's precedent allowing for a "*de minimis*" extension of a traffic stop for the purpose of conducting a drug dog sniff even without reasonable suspicion or consent. *See State v. Brimmer*, 187 N.C. App. 451, 455, 653 S.E.2d 196, 198 (2007) (adopting rule that if detention is prolonged for very short period of time in order to complete a dog sniff, intrusion is considered *de minimis*); *State v. Sellars*, ___ N.C. App. ___, ___, 730 S.E.2d 208, 212 (2012) (following *Brimmer* and applying *de minimis* rule), *appeal dismissed and disc. review denied*, 366 N.C. 395, 736 S.E.2d 489, *cert. denied*, ___ U.S. ___, 187 L. Ed. 2d 317, 134 S. Ct. 471 (2013). We disagree.

The United States Supreme Court held in *Illinois v. Caballes*, 543 U.S. 405, 410, 160 L. Ed. 2d 842, 848, 125 S. Ct. 834, 838 (2005), that "[a] dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." This Court subsequently followed *Caballes* in *State v. Branch*, 177 N.C. App. 104, 108, 627 S.E.2d 506, 509 (2006) ("[B]ased on *Caballes*, once [the defendant] was detained to verify her

driving privileges, [the two deputies] needed no heightened suspicion of criminal activity before walking [the drug dog] around her car.").

In *Brimmer*, this Court adopted the United States Court of Appeals for the Eighth Circuit's interpretation of *Caballes* in *United States v. Alexander*, 448 F.3d 1014 (8th Cir. 2006), and held that if a traffic stop is prolonged for only a very short period of time in order to conduct a dog sniff, the intrusion is considered "*de minimis*" such that "even if the traffic stop has been effectively completed, the sniff is not considered to have prolonged the detention beyond the time reasonably necessary for the stop." 187 N.C. App. at 455, 653 S.E.2d at 198. Since the dog sniff in *Brimmer* only extended the stop for slightly over one and a half minutes, the Court held that the extension was *de minimis*, and the officer needed no reasonable suspicion or consent in order to prolong the stop for the dog sniff. *Id.* at 457, 458, 653 S.E.2d at 199, 200. This Court again applied the *de minimis* rule in *Sellars* and held that the extension of a traffic stop for four minutes and 37 seconds for the purpose of a dog sniff was *de minimis* and did not violate the defendant's Fourth Amendment rights. ___ N.C. App. at ___, 730 S.E.2d at 213.

We do not believe that the *de minimis* analysis applied in *Brimmer* and *Sellars* should be extended to situations when, as here, a drug dog was not already on the scene. *Brimmer* was based, in part, on *Caballes*' holding that a dog sniff conducted during an otherwise lawful stop did not implicate the Fourth Amendment, 543 U.S. at 410, 160 L. Ed. 2d at 848, 125 S. Ct. at 838, and the reasoning of that holding is inapplicable in the absence of an actual dog sniff or the immediate availability of a drug dog.

As this Court noted in *Sellars*, the Court's earlier decision in *Falana*, 129 N.C. App. at 816, 501 S.E.2d at 360, held that an officer could not conduct a dog sniff after the original purpose of a traffic stop had been completed without grounds providing reasonable and articulable suspicion. The *Sellars* Court concluded, however, that "[t]he difference between *Falana* and *Brimmer* is that *Brimmer* incorporated the analysis contained in later United States Supreme Court and federal cases that were not in existence at the time *Falana* was decided," with the "[m]ost significant" being *Caballes* and "subsequent federal District Court and Court of Appeals decisions interpreting *Caballes*." ___ N.C. App. at ___, 730 S.E.2d at 211.

In *Caballes*, the Supreme Court was addressing a dog sniff that occurred during the course of a lawful traffic stop. The

Court, however, specifically noted a distinction between a dog sniff occurring during a routine traffic stop and one occurring during an "unreasonably prolonged traffic stop." 543 U.S. at 407, 160 L. Ed. 2d at 846, 125 S. Ct. at 837 (citing *People v. Cox*, 202 Ill.2d 462, 782 N.E.2d 275 (2002)).

In addition, the federal decisions on which *Brimmer* relied in adopting the *de minimis* exception limited that exception to situations in which the officer "ha[d] at his *immediate disposal* the canine resources to employ this uniquely limited investigative procedure" of a drug sniff. *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 649 (8th Cir. 1999) (emphasis added). In that case, the canine was already on the scene at the time of the stop. *Id.* at 645-46. Likewise, in *Alexander*, 448 F.3d at 1015-16, the defendant was stopped by a canine officer who had his drug-sniffing dog in his patrol car, and the stop was prolonged by only four minutes to conduct a dog sniff after the defendant was notified that he would receive a warning ticket.

Consequently, *Brimmer* must be limited to the situation in which a drug-sniffing dog is available at the scene of the traffic stop prior to completion of the purpose of the stop. Indeed, no North Carolina appellate court has held, as the trial court ruled here, that the *de minimis* exception applies when a

canine has not already been called to the scene prior to completion of the lawful stop. In *Brimmer*, 187 N.C. App. at 453, 653 S.E.2d at 197, the canine had arrived prior to completion of the lawful purpose of the stop, while in *Sellers*, ___ N.C. App. at ___, 730 S.E.2d at 209, the dog was present in the back of the patrol car during the entire stop.

Moreover, in *Williams*, the Supreme Court specifically considered the constitutionality of an officer's extending a stop after its lawful purpose was completed by (1) asking questions, (2) requesting consent to search the defendant's car, (3) subsequently calling for a drug-sniffing canine, and (4) having a drug sniff conducted. 366 N.C. at 112, 116-18, 726 S.E.2d at 164, 166-68. Although the officer's conduct only extended the stop by 14 minutes, the Supreme Court did not conduct a *de minimis* analysis, but rather held that the extension, including the drug sniff, was *only* permissible if supported by reasonable, articulable suspicion or consent. *Id.* at 116, 726 S.E.2d at 166. In support of this holding, the Court, *id.*, 726 S.E.2d at 166-67 (emphasis added), cited *Florida v. Royer*, 460 U.S. 491, 498, 75 L. Ed. 2d 229, 236, 103 S. Ct. 1319, 1324 (1983), as "declaring that, absent consent to a voluntary conversation or to a search, a law enforcement officer may not detain a person '*even momentarily* without reasonable,

objective grounds for doing so.'"  Thus, when the dog was summoned after completion of the purpose of the traffic stop, the Supreme Court required a showing of reasonable, articulable suspicion for the stop to be prolonged in order to conduct the dog sniff.

Here, however, the State appears to be arguing that even in the absence of reasonable, articulable suspicion, defendant's consent to a search was valid because it was obtained by Officer Payne threatening to have a dog sniff defendant's car -- an action the State contends, based on the *de minimis* cases, that Officer Payne was constitutionally allowed to do.  As this Court has acknowledged, "'[a]s a general rule, it is not duress to threaten to do what one has a legal right to do.  Nor is it duress to threaten to take any measure authorized by law and the circumstances of the case.'"  *State v. Paschal*, 35 N.C. App. 239, 241, 241 S.E.2d 92, 94 (1978) (quoting 25 Am. Jur. 2d., *Duress & Undue Influence*, § 18, p. 375).

The State has not, however, shown that Officer Payne had a legal right to conduct a dog sniff at the time that defendant gave his consent to a search.  "'*[A]t the suppression hearing*,'" the State has the burden "'of demonstrating *with particularity* a constitutionally sufficient justification of the officers' search. . . .'"  *State v. Crews*, 66 N.C. App. 671, 675, 311

S.E.2d 895, 897 (1984) (second emphasis added) (quoting *Cooke*, 306 N.C. at 136, 291 S.E.2d at 620).

First, Officer Payne did not have a canine at his "immediate disposal" since he had not yet called for a canine. *$404,905.00 in U.S. Currency*, 182 F.3d at 649. While in *Brimmer* and *Sellars*, the canine was already on the scene, Officer Payne testified at the suppression hearing that "[a]s a general rule, it typically takes no more than ten minutes, typically five, sometimes less" for a canine unit to arrive at the scene after it has been called. Since *Brimmer* approved extension of a stop for only slightly over one and a half minutes, 187 N.C. App. at 457, 653 S.E.2d at 199, and *Sellars* approved only an extension of four minutes and 37 seconds, ___ N.C. App. at ___, 730 S.E.2d at 213, just the projected time for arrival of the canine, in this case, was substantially in excess of the time periods previously found to be *de minimis* by North Carolina courts.

Moreover, at the time defendant consented to a search, approximately two minutes had already elapsed since the purpose for the traffic stop had been achieved. Consequently, even if *Brimmer* and *Sellars* could apply despite the failure to summon a canine unit before the traffic stop was completed, the State's evidence indicated that the stop would have to be extended by between seven and 12 minutes in order for the canine to arrive.

In other words, just waiting for the canine would have more than doubled the length of the stop. In addition, the State presented no evidence regarding how long it would take for the canine to deploy and alert.

Thus, even assuming that the *de minimis* rule could apply in the absence of immediate availability of a dog, the State did not present evidence that Officer Payne obtained defendant's consent to search by threatening to do something -- a dog sniff -- that he had a legal right to do. Based on the State's evidence, Officer Payne did not have the legal right to conduct a dog sniff because he did not have a canine at his immediate disposal and, in any event, the State did not establish that Officer Payne could have completed the dog sniff in a *de minimis* period of time. The State has cited no case suggesting that consent may properly be obtained by a threat to perform an act that might or might not be legal depending on how the threatened event hypothetically could unfold.[2] The State has, therefore, failed to prove that defendant's consent was valid.

----

[2]We also note that the State's argument requires that we review the videotape of the encounter with a stopwatch in hand calculating the minutes and seconds elapsing for each stage of the stop and then adding to the time by which the stop was actually extended estimates of the additional time that might typically be necessary for a canine unit to arrive. Then, we must determine how many additional minutes of detention are too many. Is seven minutes waiting for a dog too much? Eight minutes? Nine minutes? What is the basis for making that

The State nonetheless cites *State v. Barden*, 356 N.C. 316, 572 S.E.2d 108 (2002), *State v. McMillan*, 214 N.C. App. 320, 718 S.E.2d 640 (2011), and *State v. Cummings*, 188 N.C. App. 598, 656 S.E.2d 329 (2008), in support of its argument that defendant's consent to search was valid in this case. However, in *Barden*, *McMillan*, and *Cummings*, there was no indication that the respective defendants were unconstitutionally seized when they gave consent to searches or seizures of items. *See Barden*, 356 N.C. at 341, 572 S.E.2d at 125-26 (holding defendant's consent to seizure of his shoes was valid when defendant voluntarily drove to site of police interview and voluntarily gave statements concerning crime); *McMillan*, 214 N.C. App. at 331, 718 S.E.2d at 648 (holding defendant's consent to seizure of physical items was valid when defendant voluntarily went to sheriff's department, was informed he was under "'investigative detention,'" and was told he could either consent to seizure of items or officers would detain him until they could prepare and execute search warrant for items, since officers "reasonably believed they had sufficient probable cause" to obtain search warrant); *Cummings*, 188 N.C. App. at 603-04, 656 S.E.2d at 332-

---

decision?  Constitutional rights should not hinge on such arbitrary calculations and determinations.  With *Brimmer* and *Sellars*, since the dog was already there and the stop was extended only by the time necessary for the dog to sniff the vehicle and alert, such arbitrariness was not present.

33 (holding defendant's consent to search of his vehicle voluntarily given when defendant agreed to go to law enforcement headquarters for questioning and while at headquarters, signed consent form for search of vehicle). Those cases are, therefore, inapplicable here.[3]

In sum, after Officer Payne had addressed the original purpose for the traffic stop, he continued to detain defendant without either (1) defendant's valid consent or (2) reasonable, articulable suspicion of criminal activity. Accordingly, the officer's continued detention of defendant violated defendant's Fourth Amendment right against unreasonable seizures and defendant's subsequent consent to a search of his car was involuntary as a matter of law. *See Myles*, 188 N.C. App. at 51, 654 S.E.2d at 758 ("Since [the officer's] continued detention of defendant was unconstitutional, defendant's consent to the search of his car was involuntary.").

Because defendant's consent to search his car was the product of an unconstitutional seizure, the trial court erred in denying defendant's motion to suppress. Accordingly, we reverse

---

[3]Although the State also cites *State v. Wrenn*, 316 N.C. 141, 146, 147, 340 S.E.2d 443, 447, 448 (1986), the defendant in *Wrenn* was lawfully arrested at the time his car was searched, and the search was, therefore, a valid search incident to the defendant's arrest.

and remand to the trial court for entry of an order vacating defendant's guilty pleas.

Reversed and remanded.

Judges STEPHENS and ERVIN concur.