IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA16-33

 Filed: 20 September 2016

Johnston County, No. 14 CRS 54773, 14 CRS 54776

STATE OF NORTH CAROLINA

 v.

DAVID MICHAEL REED, Defendant.

 Appeal by Defendant from a judgment entered 21 July 2015 by Judge Thomas

H. Lock in Johnston County Superior Court. Heard in the Court of Appeals 6 June

2016.

 Attorney General Roy Cooper, by Special Deputy Attorney General E. Burke
 Haywood, for the State.

 Patterson Harkavy LLP, by Paul E. Smith, for Defendant-Appellant.

 HUNTER, JR., Robert N., Judge.

 David Michael Reed (“Defendant”) filed a motion to suppress evidence found

during a traffic stop. On 14 July 2015, Judge Gale Adams entered an order denying

Defendant’s motion to suppress. On 21 July 2015, Defendant pled guilty, pursuant

to a written agreement, to trafficking more than 200 grams but less than 400 grams

of cocaine by transportation, and trafficking more than 200 grams but less than 400

grams of cocaine by possession. In exchange for his guilty plea, the State agreed to

dismiss charges against his co-defendant, consolidate his two trafficking charges for
 STATE V. REED

 Opinion of the Court

judgment, and stipulate to an active sentence of 70 to 93 months imprisonment with

a $100,000.00 fine. The trial court accepted the plea agreement and sentenced

Defendant to 70 to 93 months imprisonment and imposed a $100,000.00 fine and

$3,494.50 in court costs. Defendant timely entered his notice of appeal and contends

the trial court committed error in denying his motion to suppress. We agree and

reverse the trial court.

 I. Factual and Procedural Background

 At 8:18 a.m. on 9 September 2014, Defendant drove a rented Nissan Altima

faster than the posted 65 mph speed limit on Interstate 95 (“I-95”) in Johnston

County, North Carolina. His fiancée, Usha Peart, rode in the front passenger seat

and held a female pit bull in her lap. Trooper John W. Lamm, of the North Carolina

State Highway Patrol, was parked in the median of I-95. Trooper Lamm used his

radar to determine Defendant was traveling 78 mph, and performed a traffic stop for

Defendant’s speeding infraction. Trooper Lamm’s patrol car had a camera that faced

forwards towards the hood of the vehicle, and recorded audio inside and outside of

the patrol car.

 Defendant pulled over on the right shoulder of I-95, Trooper Lamm pulled

behind him, and Trooper Lamm approached the passenger side of the Nissan.

Trooper Lamm saw energy drinks, trash, air fresheners, and dog food scattered on

 -2-
 STATE V. REED

 Opinion of the Court

the floor of the vehicle. He asked if the dog in Peart’s lap was friendly and Defendant

and Peart said that the dog was friendly.

 Trooper Lamm stuck his arm inside the vehicle to pet the dog and asked

Defendant for his driver’s license and the rental agreement. Defendant gave Trooper

Lamm his New York driver’s license, a registration card, and an Enterprise rental

car agreement. The rental agreement listed Peart as the renter and Defendant as an

authorized driver. Trooper Lamm told Defendant “come on back here with me”

motioning towards his patrol car.

 Defendant exited the Nissan and Trooper Lamm asked if he had any guns or

knives on his person. Defendant asked Trooper Lamm why the frisk was necessary,

and Trooper Lamm replied, “I’m just going to pat you down for weapons because

you’re going to have a seat with me in the car.” Trooper Lamm found a pocket knife,

said it was “no big deal,” and put it on the hood of the Nissan

 Trooper Lamm opened the passenger door of his patrol car. His K-9 was in the

back seat of the patrol car at that time. Defendant sat in the front passenger seat

with the door open and one leg outside of the car. Trooper Lamm told Defendant to

close the door. Defendant hesitated and said he was “scared” to close the door; Lamm

replied, “Shut the door. I’m not asking you, I’m telling you to shut the door. I mean

you’re not trapped, the door [is] unlocked. Last time I checked we were the good

guys.” Defendant said, “I’m not saying you’re not,” and Trooper Lamm said, “You

 -3-
 STATE V. REED

 Opinion of the Court

don’t know me, don’t judge me.” Defendant said he was stopped before in North

Carolina, but he was never taken to the front passenger seat of a patrol car during a

stop. Following Trooper Lamm’s orders, Defendant closed the front passenger door.

 Trooper Lamm ran Defendant’s New York license through record checks on his

mobile computer. While doing so, Trooper Lamm asked Defendant about New York,

and “where are y’all heading to?” Defendant said he was visiting family in

Fayetteville, North Carolina. Trooper Lamm noted the rental agreement restricted

travel to New York, New Jersey, and Connecticut, but told Defendant the matter

could likely be resolved with a phone call to the rental company.

 Then, Trooper Lamm asked Defendant about his criminal history. Defendant

admitted he was arrested for robbery in the past, when he was in the military.

Trooper Lamm asked Defendant about his living arrangements with Peart, and

whether he or Peart owned the dog in the Nissan. Trooper Lamm noticed the rental

agreement was drafted for a Kia Rio not a Nissan Altima. Trooper Lamm exited the

patrol car to ask Peart for the correct rental agreement, and told Defendant to “sit

tight.”

 Trooper Lamm approached the front passenger side of the Nissan Altima and

asked Peart for the correct rental agreement. He asked about her travel plans with

Defendant and the nature of their trip. She said they were visiting family in

Fayetteville but might also travel to Tennessee or Georgia. She explained the first

 -4-
 STATE V. REED

 Opinion of the Court

rental car they had, the Kia Rio, was struck by another car and the rental company

gave them the Nissan Altima as a replacement. She could not find the rental

agreement for the Nissan Altima and continued to look for it. Trooper Lamm told

Peart he was going to issue Defendant a speeding ticket and the two would “be on

[their] way.”

 Trooper Lamm returned to the patrol car, explained Peart could not locate the

correct rental agreement, and continued to question Defendant about the purpose of

the trip to Fayetteville. Then, Trooper Lamm called the rental company and the

rental company confirmed everything was fine with the Nissan Altima rental, but

informed Trooper Lamm that Peart still needed to call the company to correct the

restricted travel condition concerning use of the car in New York, New Jersey, and

Connecticut. After the call, Trooper Lamm told Defendant that his driver’s license

was okay and he was going to receive a warning ticket for speeding. Trooper Lamm

issued a warning ticket and asked Defendant if he had any questions.

 Then, Trooper Lamm told Defendant he was “completely done with the traffic

stop,” but wanted to ask Defendant additional questions. Defendant did not make an

audible response, but at the suppressing hearing, Trooper Lamm testified Defendant

nodded his head. Trooper Lamm did not tell Defendant he was free to leave.

 Trooper Lamm asked Defendant if he was carrying a number of controlled

substances, firearms, or illegal cigarettes in the Nissan Altima. Defendant

 -5-
 STATE V. REED

 Opinion of the Court

responded, “No liquor, no nothing, you can break the car down.” Trooper Lamm

continued questioning Defendant and said, “I want to search your car, is that okay

with you?” Defendant hesitated, mumbled, and told Trooper Lamm to ask Peart.

Defendant stated, “I’m just saying, I’ve got to go to the bathroom, I want to smoke a

cigarette, we’re real close to getting to the hotel so that we can see our family, like, I

don’t, I don’t see a reason why.” Trooper Lamm responded, “[W]ell let me go talk to

her then, sit tight,” and walked to the front passenger side of the Nissan Altima. By

this time, two additional officers were present at the scene.

 Trooper Lamm told Peart everything was fine with the rental agreement and

asked her the same series of questions he asked Defendant, whether the two were

carrying controlled substances, firearms, or illegal cigarettes. Trooper Lamm asked

Peart if he could search the car. Peart hesitated, expressed confusion, and stated,

“No. There’s nothing in my car, I mean . . . .” Trooper Lamm continued to ask for

consent, Peart acquiesced and agreed to sign a written consent form. Trooper Lamm

searched the Nissan Altima and found cocaine under the back passenger seat.

 II. Standard of Review

 Our review of a trial court’s denial of a motion to suppress is “strictly limited

to determining whether the trial judge’s underlying findings of fact are supported by

competent evidence, in which event they are conclusively binding on appeal, and

whether those factual findings in turn support the judge’s ultimate conclusions of

 -6-
 STATE V. REED

 Opinion of the Court

law.” State v. Cooke, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). “The trial court’s

conclusions of law . . . are fully reviewable on appeal.” State v. Hughes, 353 N.C. 200,

208, 539 S.E.2d 625, 631 (2000).

 III. Analysis

 Defendant contends the trial court made findings of fact that are not supported

by competent evidence because his “initial investigatory detention was not properly

tailored to address a speeding violation.” Further, he contends Trooper Lamm seized

him without consent or reasonable suspicion of criminal activity when Trooper Lamm

told him to “sit tight” in the patrol car. Defendant contends Trooper Lamm

unlawfully seized items from the car during the search, and these items are fruit of

the poisonous tree that must be suppressed. After carefully reviewing the record and

video footage of the traffic stop, we agree.

 On appeal, Defendant challenges the following findings of fact and conclusion

of law:

 FINDINGS OF FACT
 11. That the Defendant complied with Trooper Lamm’s
 request1 to accompany him back to the patrol vehicle where
 Trooper Lamm told the Defendant, while the Defendant
 was still outside the vehicle, that he was stopped for
 speeding, which the Defendant acknowledged stating that
 he “was running about 84” . . . .

 21. That while Ms. Peart looked for the current rental

 1 Defendant contends the trial court’s “determination of [Trooper] Lamm’s statement to be a
‘request’ rather than a command or order is actually a conclusion of law . . . because it requires the
exercise of judgment.”

 -7-
 STATE V. REED

 Opinion of the Court

 agreement, which was never found, Trooper Lamm
 engaged her in casual conversation and learned from her
 that she was unsure of their travel plans, but believed they
 were visiting family in “Fayetteville or maybe Tennessee
 or Georgia. . . .”

 26. That after asking the Defendant if he could search his
 car, the [D]efendant expressed reluctance before directing
 Trooper Lamm to ask Ms. Peart since she was the lessee of
 the vehicle. At which time, Trooper Lamm left the patrol
 car, asked the Defendant to sit tight, and went to ask Ms.
 Peart. . . .

 CONCLUSIONS OF LAW
 2. That Trooper Lamm was at all times casual and
 conversational in his words and manner.

 “[T]he tolerable duration of police inquires in the traffic-stop context is

determined by the seizure’s ‘mission’—to address the traffic violation that warranted

the stop, and attend to related safety concerns.” State v. Bedient, ___ N.C. App. ___,

786 S.E.2d 319, 322 (2016) (quoting Rodriguez v. United States, ___ U.S. ___, ___, 135

S.Ct. 1609, 1614 (2015) (internal citations omitted)). In addition to deciding whether

to issue a traffic ticket, a law enforcement officer’s “mission” includes “‘ordinary

inquires incident to the traffic stop.’” Bedient, ___ N.C. App. at ___, 786 S.E.2d at 322

(quoting Rodriguez, ___ U.S. at ___, 135 S.Ct. at 1615). This inquiry typically includes

checking the driver’s license, determining if the driver has any outstanding warrants,

inspecting the vehicle’s registration and proof of insurance, or a rental agreement for

a rental car, which is the equivalent of inspecting a vehicle’s registration and proof of

insurance. See Bedient, ___ N.C. App. at ___, 786 S.E.2d at 322–23 (quoting

 -8-
 STATE V. REED

 Opinion of the Court

Rodriguez, ___ U.S. at ___, 135 S.Ct. at 1615); See also State v. Bullock, ___ N.C. App.

___, 785 S.E.2d 746, 751 (2016), writ of supersedeas allowed, 786 S.E.2d 927 (2016).

 The trial court held its suppression hearing 1 June 2015 and issued an order

denying Defendant’s motion to suppress on 10 July 2015. If the trial court had the

benefit of this Court’s guidance in Bullock, ___ N.C. App. ___, 785 S.E.2d 746, it may

have ruled in Defendant’s favor.

 In Bullock, this Court examined a fact pattern that is nearly identical to the

case sub judice and applied the principles of Rodriguez, ___ U.S. ___, 135 S.Ct. 1609.

In Bullock, the defendant sped and followed another vehicle too closely on the

highway. Bullock, ___ N.C. App. at ___, 785 S.E.2d at 747–48. When the officer

pulled Bullock over, he asked for Bullock’s license and rental agreement. Id., ___

N.C. App. at ___, 785 S.E.2d at 748. The rental agreement did not list Bullock’s name,

though it appeared he wrote his name on the form below the renter’s signature. Id.

The officer saw two cell phones in the car and noticed Bullock’s hands were “trembling

a little.” Id. The officer asked Bullock where he was traveling. Id. Bullock said he

was driving to meet a girl and missed his exit on the highway. Id. The officer “asked

[Bullock] to step back to his patrol car while he ran [Bullock’s] driver’s license.” Id.

The officer “shook hands with [Bullock] and told him that he would give him a

warning for the traffic violation.” Id. The officer “then asked if he could briefly search

[Bullock] for weapons before he got into his patrol car.” Id. Bullock “agreed and lifted

 -9-
 STATE V. REED

 Opinion of the Court

his arms up in the air . . . .” Id. Bullock sat in the front seat of the patrol car as the

officer ran his driver’s license through a mobile computer. Id. The officer’s K-9 was

in the back seat. Id. While the officer and Bullock sat in the front seats, the officer

questioned Bullock. Id. The officer thought Bullock “looked nervous while he was

questioning him . . .” and saw he was “‘breathing in and out in his stomach’ and not

making much eye contact.” Id. The officer attributed this nervousness “to something

other than general anxiety from a routine traffic stop” because he already told Bullock

he was going to issue a warning ticket. Id., ___ N.C. App. at ___, 785 S.E.2d at 751.

The officer asked Bullock “if there were any weapons or drugs in the car and if he

could search the vehicle.” Id., ___ N.C. App. at ___, 785 S.E.2d at 748. Bullock

consented to the search except for his personal belongings, which included a bag,

some clothes, and condoms. Id. The officer called for a backup officer and explained

he could not search without another officer present. Id. While they waited

approximately ten minutes for a backup officer to arrive, Bullock asked “what would

happen if he did not consent to a search of the car,” and the officer stated “he would

then deploy his K-9 dog to search the car.” Id. “At that time, [Bullock] and [the

officer] spoke some more about the girl [Bullock] was going to see and other matters

unrelated to the traffic stop.” Id. The backup officer arrived, searched the car, and

found 100 bindles of heroin. Id., ___ N.C. App. at ___, 785 S.E.2d at 749.

 - 10 -
 STATE V. REED

 Opinion of the Court

 The Bullock Court applied the United States Supreme Court’s guidance in

Rodriguez and held the officer could check Bullock’s license and rental agreement,

but he “was not allowed to ‘do so in a way that prolonged the stop, absent the

reasonable suspicion ordinarily demanded to justify detaining an individual.’” Id.,

___ N.C. App. at ___, 785 S.E.2d at 751 (quoting Rodriguez, ___ U.S. at ___, 135 S.Ct.

at 1615). This Court held, “[the officer] completed the mission of the traffic stop when

he told [Bullock] that he was giving [Bullock] a warning for the traffic violations as

they were standing at the rear of [Bullock’s] car.” Id.

 Here, Trooper Lamm’s authority to seize Defendant for the speeding infraction

ended “when tasks tied to the traffic infraction [were]—or reasonably should have

been—completed.” Rodriguez, ___ U.S. at ___, 135 S.Ct. at 1614 (emphasis added)

(citation omitted). At the very latest, this occurred when Trooper Lamm told

Defendant he was going to issue a warning ticket and gave him a hard copy of the

warning ticket. See Bullock, ___ N.C. App. at ___, 785 S.E.2d at 751. Beyond this

identifiable point in time, this Court notes an officer may not delay telling a driver

they are going to receive a ticket (or warning ticket), withhold writing or providing a

written copy of the ticket (or warning ticket), withhold the driver’s license, car

registration, rental agreement, or other pertinent documents, in such a way that

prolongs “‘the stop, absent the reasonable suspicion ordinarily demanded to justify

detaining an individual.’” Id. (quoting Rodriguez, ___ U.S. at ___, 135 S.Ct. at 1615).

 - 11 -
 STATE V. REED

 Opinion of the Court

 Prior to Rodriguez, it was well settled that an officer may ask a driver to exit

a vehicle during a traffic stop. See State v. McRae, 154 N.C. App. 624, 629, 573 S.E.2d

214, 218 (2002) (citations omitted). Historically, the de minimis intrusion of asking

a driver to exit a vehicle was outweighed by “the government’s ‘legitimate and

weighty’ interest in officer safety . . . .” Rodriguez, ___ U.S. at ___, 135 S.Ct. at 1615

(quoting Pennsylvania v. Mimms, 434 U.S. 106, 110–11 (1977) (per curiam)).

However, “under Rodriguez, even a de minimis extension is too long if it prolongs the

stop beyond the time necessary to complete the mission.” Bullock, ___ N.C. App. at

___, 785 S.E.2d at 752. Therefore, an officer may offend the Fourth Amendment if he

unlawfully extends a traffic stop by asking a driver to step out of a vehicle. See Id.

The same is true of an officer who unlawfully extends a traffic stop by asking a driver

to sit in his patrol car, thereby creating the need for a weapons pat down.2 It is also

possible for an officer to unlawfully extend a traffic stop by telling a driver to close

the patrol car’s front passenger door, while the officer questions the driver about

matters unrelated to the traffic stop. Further, this Court notes officer safety is put

at risk an increased number of times when an officer adds additional steps to delay

the traffic stop, such as ordering the driver to step out of the vehicle, patting the

 2 “By requiring defendant to submit to a pat-down search and questioning in the patrol car
unrelated to the purpose of the traffic stop, the officer prolonged the traffic stop beyond the time
necessary to complete the stop’s mission and the routine checks authorized by Rodriguez.” Bullock,
___ N.C. App. at ___, 785 S.E.2d at 753 (citing State v. Castillo, ___ N.C. App. ___, 787 S.E.2d 48
(2016)).

 - 12 -
 STATE V. REED

 Opinion of the Court

driver down, having the driver sit in the patrol car, and sitting next to the driver to

ask them questions and observe their demeanor.

 To detain a driver beyond a traffic stop, an officer must have “reasonable

articulable suspicion that illegal activity is afoot.” State v. Williams, 366 N.C. 110,

116, 726 S.E.2d 161, 166–67 (2012) (citing Florida v. Royer, 460 U.S. 491, 497–98

(1983)) (citation omitted). An officer is “required to have reasonable suspicion before

asking [a] defendant to go to his patrol vehicle to be questioned.” Bullock, ___ N.C.

App. at ___, 785 S.E.2d at 753. During a lawful traffic stop, an officer “may conduct

a pat down search, for the purpose of determining whether the person is carrying a

weapon, when the officer is justified in believing that the individual is armed and

presently dangerous.” State v. Sanders, 112 N.C. App. 477, 480, 435 S.E.2d 842, 844

(1993) (citing Terry v. Ohio, 392 U.S. 1, 24 (1968); Minnesota v. Dickerson, 508 U.S.

366, 373 (1993)) (emphasis added).

 Here, the trial court found Trooper Lamm had “sufficient reasonable suspicion

of criminal activity to continue the traffic stop beyond the speeding enforcement

action” for the following reasons:

 a. Defendant was overly nervous for a traffic stop for
 speeding.

 b. Defendant would not close the patrol car door until
 ordered to do so, stating that he was “scared to do that” and
 had one leg out of the door.

 c. Defendant gave the Trooper a rental agreement for a

 - 13 -
 STATE V. REED

 Opinion of the Court

 different car than he was operating and that car was paid
 for in cash.

 d. Defendant was operating the car outside of the approved
 area for travel, New York, New Jersey, and Connecticut.

 e. He noted the presence of numerous air fresheners in the
 vehicle.

 f. The vehicle had a lived in look showing hard travel, such
 as, coffee, energy drinks, and trash.

 g. The presence of a female dog in the car and dog food
 scattered throughout the car.

 h. The driver and passenger provided inconsistent travel
 plans.

 The trial court’s findings do not support its conclusion that Trooper Lamm had

reasonable suspicion of criminal activity to extend the traffic stop and conduct a

search after the traffic stop concluded. The various legal behaviors in the trial court’s

findings do not amount to a “reasonable articulable suspicion that illegal activity is

afoot.” Williams, 366 N.C. at 116, 726 S.E.2d at 166–67 (citing Royer, 460 U.S. at

497–98) (citation omitted). “In order to preserve an individual’s Fourth Amendment

rights, it is of the utmost importance that we recognize that the presence of [a

suspicious but legal behavior] is not, by itself, proof of any illegal conduct and is often

quite consistent with innocent travel.” State v. Fields, 195 N.C. App. 740, 745, 673

S.E.2d 765, 768 (2009) (citing United States v. Sokolow, 490 U.S. 1, 9 (1989)).

Reasonable suspicion may arise from “wholly lawful conduct.” Reid v. Georgia, 448

 - 14 -
 STATE V. REED

 Opinion of the Court

U.S. 438, (1980) (citing Terry, 392 U.S. at 27–28). However, “‘the relevant inquiry is

. . . the degree of suspicion that attaches to particular types of noncriminal acts.’”

Sokolow, 490 U.S. at 10 (quoting Illinois v. Gates, 462 U.S. 213, 243–44 n. 13 (1983)).

 Here, Defendant’s nervousness is “an appropriate factor to consider,” but it

must be examined “in light of the totality of the circumstances” because “many people

do become nervous when [they are] stopped by an officer . . . .” State v. McClendon,

350 N.C. 630, 638, 517 S.E.2d 128, 134 (1999) (citations omitted). The degree of

suspicion attached to Defendant’s possession of a female dog, dog food, coffee, energy

drinks, trash, and air fresheners is minimal, as it is consistent with innocent travel.

 Most importantly, the trial court’s findings are based upon facts that were

discovered after the “tolerable duration” of the speeding stop expired, namely

Defendant’s nervousness and his fear about closing the front passenger door of the

patrol car. See Bedient, ___ N.C. App. at ___, 786 S.E.2d at 322 (quoting Rodriguez,

___ U.S. ___, ___, 135 S.Ct. at 1614). Rodriguez clearly changes the law and traffic

stop procedures that existed prior to its issuance on 21 April 2015. To affirm the trial

court, as the dissent suggests, is to ignore the United States Supreme Court’s

direction in Rodriguez, ___ U.S. ___, 135 S.Ct. 1609.

 IV. Conclusion

 For the foregoing reasons, we reverse the trial court.

 REVERSED.

 - 15 -
 STATE V. REED

 Opinion of the Court

Chief Judge McGEE concurs.

Judge DILLON dissents in a separate opinion.

 -2-
 No. COA16-33 – STATE v. REED

 DILLON, Judge, dissenting.

 Because I agree with the State that Judge Adams’ findings support a

conclusion that Trooper Lamm obtained Defendant’s consent to search the rental

vehicle after the traffic stop had concluded and Defendant was otherwise free to leave,

I respectfully dissent.

 Assuming, arguendo, that Trooper Lamm’s exchange with Defendant following

the conclusion of the traffic stop was non-consensual and that Defendant’s “consent”

was coerced, I believe that Trooper Lamm had reasonable suspicion of separate,

independent criminal activity to support an extension of the traffic stop beyond the

time necessary to complete the mission of citing Defendant for the traffic violation.

 I. There Was the Consensual Search After Traffic Stop Had Concluded and
 Defendant Was Free to Leave.

 Judge Adams’ findings support her conclusion that Trooper Lamm obtained

Defendant’s voluntary consent after Defendant was otherwise free to leave the scene.

 The majority contends that Defendant’s consent to search the car was

ineffective since Trooper Lamm impermissibly extended the traffic stop in violation

of the principles set out in Rodriguez v. United States, 135 S. Ct. 1609 (2015). See

also Florida v. Royer, 460 U.S. 491, 507-08 (1983) (holding that a defendant’s consent

to a search is ineffective to justify the search when the consent is obtained while the

defendant is being illegally detained). Rodriguez is certainly an important

development in Fourth Amendment law, clarifying that even a de minimis extension
 STATE V. REED

 DILLON, J., dissenting

of a traffic stop to investigate matters unrelated to the mission of the traffic stop

without reasonable suspicion of separate criminal activity is impermissible.

However, this principle in Rodriguez is inapplicable here as Trooper Lamm did not

extend the traffic stop to question Defendant and then search Defendant’s rental

vehicle. Rather, Judge Adams’ findings show that Trooper Lamm concluded the

traffic stop and then obtained Defendant’s consent only after his exchange with

Defendant evolved into a consensual encounter. For the same reasons, our case is

distinguishable from our recent decision in State v. Bullock, ___ N.C. App. ___, 785

S.E.2d 746 (2016), which is cited by the majority, where we applied Rodriguez to

invalidate a search based on the impermissible extension of a traffic stop. Bullock

did not involve a situation where a traffic stop had concluded and the encounter

became consensual.

 There is no detention for Fourth Amendment purposes when law enforcement

engages with a defendant unless a reasonable person in the defendant’s position

“would have believed he was not free to leave.” United States v. Mendenhall, 446 U.S.

544, 554 (1980). In the context of a traffic stop, the detention of a motorist is a seizure

for Fourth Amendment purposes. However, when the traffic stop is over and the

detainee is free to leave, the traffic stop transforms into a consensual encounter: the

officer may ask questions, and the detainee can choose to answer them or simply

refuse to answer and leave.

 2
 STATE V. REED

 DILLON, J., dissenting

 Our Court has held on a number of occasions that “[g]enerally, an initial traffic

stop concludes and the encounter becomes consensual . . . after an officer returns the

detainee’s driver’s license and registration.” State v. Jackson, 199 N.C. App. 236, 243,

681 S.E.2d 492, 497 (2009). See also State v. Henry, 237 N.C. App. 311, 324, 765

S.E.2d 94, 104 (2014) (recognizing that “a traffic stop is not terminated until after the

officer returns the driver’s license or other documents to the driver”); State v. Cottrell,

234 N.C. App. 736, 742-43, 760 S.E.2d 274, 279 (2014) (restating the general principle

that the return of motorist documentation typically renders any subsequent

exchanges between motorist and law enforcement consensual). In State v. Kincaid,

we recognized that “subject to a totality of the circumstances test, that once an officer

returns the license and registration, the stop is over and the person is free to leave.”

147 N.C. App. 94, 99, 555 S.E.2d 294, 298 (2001).

 Likewise, the Fourth Circuit Court of Appeals has consistently held that a

motorist is no longer detained after the officer gives the motorist his or her license

and other paperwork, absent some other factor which might indicate restraint. See,

e.g., United States v. Sullivan, 138 F.3d 126, 133-34 (4th Cir. 1998); United States v.

Whitney, 391 F. App’x. 277, 280-81 (4th Cir. 2010); United States v. Meikle, 407 F.3d

670, 673-74 (4th Cir. 2005).

 Here, Judge Adams found that Trooper Lamm did not seek Defendant’s

consent to search the rental car until after returning Defendant’s paperwork back to

 3
 STATE V. REED

 DILLON, J., dissenting

him and informing Defendant that the traffic stop had concluded. There is no finding

to suggest any restraint or compulsion by Trooper Lamm when he obtained

Defendant’s consent to search the rental vehicle. That is, Trooper Lamm did not

simply launch into an interrogation after returning to Defendant his license and other

paperwork. Rather, Judge Adams found that Trooper Lamm took the extra step of

first asking Defendant for his consent to question him further. See Kincaid, 147 N.C.

App. at 102, 555 S.E.2d at 300 (holding in a similar situation when the officer “asked

if he could question defendant . . . [,] [he] did not deprive defendant of freedom of

action in any significant way. After [the officer] handed back defendant’s license and

registration, defendant was free to leave and free to refuse to answer questions”).

Judge Adams also found that Trooper Lamm “was at all times casual and

conversational in his words and manner.”3 See Sullivan, 138 F.3d at 133 (finding

relevant that “there is no indication that [the officer] employed any physical force or

engaged in any outward displays of authority”). Also significant is that the

questioning occurred on a public highway during the daytime.

 It is true that there is no indication (or finding) that Trooper Lamm ever told

Defendant that he “was free to leave.” The United States Supreme Court, however,

has held that an officer is not required to inform a detainee that he is free to leave to

 3 Defendant challenges the finding regarding the casualness of the conversation; however, he
does not challenge this finding with regards to any portion of the encounter occurring after Trooper
Lamm informed Defendant that the traffic stop was completed.

 4
 STATE V. REED

 DILLON, J., dissenting

transform a traffic stop into a consensual encounter. Ohio v. Robinette, 519 U.S. 33,

39-40 (1996) (concluding that it would “unrealistic to require police officers to always

inform detainees that they are free to go before a consent to search may be deemed

voluntary.”). The Fourth Circuit has reached this same conclusion. Sullivan, 138

F.3d at 133 (“While [the officer] never told [the defendant] that he was free to go, that

fact alone is not dispositive.”) And our Court has also reached this same conclusion.

Kincaid, 147 N.C. App. at 97, 555 S.E.2d at 297 (affirming the trial court’s conclusion

that the defendant was free to leave “although the officer never told defendant that

he was free to leave”).

 It is also true that Judge Adams found that after Defendant gave Trooper

Lamm consent to search the rental vehicle (subject to Ms. Peart’s consent), Trooper

Lamm asked Defendant to “sit tight” in the unlocked patrol car while he returned to

the rental vehicle to ask Ms. Peart for her consent, which she gave. Given the context

of Trooper Lamm’s request that Defendant “sit tight,” I believe that a reasonable

person in Defendant’s position would have still felt that he could have withdrawn his

consent and terminated the encounter.4 Trooper Lamm only “asked” Defendant to sit

 4 By this point, another officer was on the scene who remained with Defendant while Trooper
Lamm sought Ms. Peart’s consent to search the vehicle. Defendant could have simply told this other
officer that he was withdrawing his consent and that he was going to leave.

 5
 STATE V. REED

 DILLON, J., dissenting

tight and only did so after Defendant had already given his consent and after

Defendant “direct[ed] Trooper Lamm to ask Ms. Peart” for her consent.5

 In conclusion, I believe that Defendant gave consent to search the car after the

traffic stop concluded and the encounter between Defendant and Trooper Lamm

became consensual. Therefore, I would affirm Judge Adams’ order.

 II. Trooper Lamm Otherwise Had Reasonable Suspicion to Extend the Stop.

 Assuming, arguendo, that the traffic stop did not become consensual after

Trooper Lamm returned all of the paperwork to Defendant, informed Defendant that

the traffic stop had concluded, and asked Defendant for his consent to question him

further, I believe that Judge Adams’ findings support her conclusion that Trooper

Lamm had reasonable suspicion that Defendant was transporting illegal drugs.

 The majority likens this case to our recent decision in Bullock, which applied

Rodriguez and held that a traffic stop cannot be extended beyond the time necessary

to complete the mission of the traffic stop (issuing the citation, processing tags,

reviewing driver’s license information, etc.), without reasonable suspicion of some

other crime being afoot. Bullock , ___ N.C. App. at ___, 785 S.E.2d at 752. Admittedly,

there are similarities between the facts in Bullock and Judge Adams’ findings in the

 5 Defendant does not make any argument concerning whether Ms. Peart would not have felt
free to leave when she gave her consent to search the vehicle or any argument about the impact the
validity of Ms. Peart’s consent should have on our analysis in this prosecution of Defendant. Therefore,
any issue concerning Ms. Peart’s consent is not before us.

 6
 STATE V. REED

 DILLON, J., dissenting

present case. Specifically, in Bullock, our Court determined that the defendant’s

presence on a busy interstate typically used for drug trafficking, the defendant’s

unauthorized operation of a rental vehicle,6 the defendant’s nervous behavior, and

the defendant’s statement that he had missed an exit to explain his erratic driving

did not give rise to a “particularized suspicion of criminal activity” permitting

extension of the traffic stop to conduct a frisk of the defendant. Id. at ___, 785 S.E.2d

at 753-56. In reaching its conclusion, our Court relied on the Fourth Circuit’s

acknowledgment that:

 [T]he Supreme Court has recognized that factors
 consistent with innocent travel can, when taken together,
 give rise to reasonable suspicion. On the other hand, the
 articulated innocent factors collectively must serve to
 eliminate a substantial portion of innocent travelers before
 the requirement of reasonable suspicion will be satisfied.

Id. at ___, 785 S.E.2d at 754 (quoting U.S. v. Digiovanni, 650 F.3d 498, 511 (4th Cir.

2011)) (emphasis added) (internal citations and marks omitted).

 Judge Adams found additional facts which, I believe, distinguish this case from

Bullock. For instance, the trial court found that the following events occurred before

Trooper Lamm committed any act which could arguably be related to the traffic stop:

 6. Trooper Lamm observed a female in the front passenger
 seat holding an adult female pit bull dog and defendant in
 driver’s seat.

 7. Trooper Lamm noticed the presence of . . . dog food

 6The rental agreement in the present case only allowed the vehicle to be driven in New York,
New Jersey, and Connecticut.

 7
 STATE V. REED

 DILLON, J., dissenting

 scattered throughout the interior of the vehicle.

 8. Trooper Lamm knew that the presence of a female dog
 and dog food are sometimes used to distract a male canine
 during a dog sniff.

 9. Trooper Lamm noticed several air fresheners which
 Trooper knew are sometimes used to mask the odor of a
 controlled substance.

 Indeed, in Digiovanni, which was relied upon by our Court in Bullock, the

Fourth Circuit opined that the presence of air fresheners would have had an impact

on their determination that no reasonable suspicion existed to extend the stop.

Digiovanni, 650 F.3d at 513. I believe that these additional findings were sufficient

to “eliminate a substantial portion of innocent drivers,” Bullock, ___ N.C. App. at ___,

785 S.E.2d at 754, and supported the conclusion that Trooper Lamm had reasonable

suspicion that criminal activity was afoot to justify an extension of the traffic stop.

See State v. Warren, ___ N.C. App.___, ___, 775 S.E.2d 362, 365-66 (2015) (holding

that Rodriguez was not violated and that there was reasonable suspicion to conduct

a dog sniff search).

 8